Rodney Allen COLE, Appellant,

v.

Benita COLE, Appellee.

No. 2–93–186–CV.

Court of Appeals of Texas,
Fort Worth.

June 22, 1994.

Publication Ordered July 13, 1994.

478

G. Thomas Vick, Jr., Weatherford, for appellant.

John W. Hughes, Simon, Anisman, Doby & Wilson, P.C., Fort Worth, for appellee.

Before FARRIS, WEAVER and HICKS, JJ.

OPINION

HICKS, Justice.

In this divorce case, appellant Rodney Cole raises eleven points of error challenging the sufficiency of the evidence to support the trial court's findings regarding conservatorship, child support, valuation and distribution of the community estate, and a lien on the community homestead. We affirm in part and reverse and remand in part.

Rodney and appellee Benita Cole were married on December 31, 1972. They have two sons, Rodney, Jr., age eighteen at the time of trial, and Jackie, age fifteen at the time of trial. The Coles separated on June 11, 1992, and Rodney filed for divorce on August 18, 1992. A short time later, Benita filed a cross-action for divorce. After a non-jury trial, the trial court granted the divorce, appointed the parties joint managing conservators of their minor child, appointed Benita Jackie's primary joint managing conservator, ordered Rodney to pay $300 a month in child support, and divided the community estate.

 In a case tried to the court, findings of fact have the same force and dignity as a jury's verdict upon questions and are reviewable for legal and factual sufficiency of the evidence by the same standards applicable in reviewing the sufficiency of the evidence supporting a jury's finding. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 794 (Tex.1991). In considering a "no evidence"

or legal sufficiency point, we consider only the evidence favorable to the decision of the trier of fact and disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965). In considering a factual sufficiency point, we assess all the evidence and reverse for a new trial only if the challenged finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

**I. CONSERVATORSHIP**

In his first point of error, Rodney asserts that the evidence is legally and factually insufficient to support the court's findings that Benita should be appointed Jackie's primary joint managing conservator and that it is in Jackie's best interest to be placed in Benita's custody. Since their parents' separation, Jackie and Rodney, Jr. have continued to live with their father in the community homestead in Weatherford, Texas. Rodney, Jr. testified he wished to remain living with his father. Benita now lives in Lampasas, Texas. At trial she admitted that Jackie asked to live with his father.

In determining the question of managing conservatorship of a child, the primary consideration of the court shall always be the best interest of the child. TEX.FAM.CODE ANN. § 14.07(a) (Vernon Supp.1994). The trial court is given wide latitude in determining the best interest of a minor child for purposes of making a custody award, and its judgment will not be disturbed on appeal unless it is shown from the record as a whole that the court abused its discretion. *Gillespie v. Gillespie,* 644 S.W.2d 449, 451 (Tex. 1982); *Hopkins v. Hopkins,* 853 S.W.2d 134, 136 (Tex.App.—Corpus Christi 1993, no writ); *MacDonald v. MacDonald,* 821 S.W.2d 458, 460 (Tex.App.—Houston [14th Dist.] 1992, no writ).

Benita testified that when she and Rodney separated, she left the house because she was

in fear for her life. She stated that Rodney had abused and threatened her. Benita also testified that she did not think Rodney was a proper role model for the boys. For example, on a Saturday night after the separation, Benita went to visit the children at their father's house. Rodney was out of town, and the boys had thirty to forty teenagers over for a party. Both of the Cole boys were drinking beer and had been shooting high-caliber rifles. On another occasion, Benita went out to the house to pick up some of her clothes and found two naked strippers asleep in her bed. Rodney had just left for work, and Jackie was downstairs asleep. Benita also suspects Rodney was involved in drugs and drug trafficking, although she admits she cannot prove it.

Benita's mother, Delta McLauchlin, testified that she has lived with Rodney and her grandsons for the past two-and-a-half years. She has never witnessed any evidence of abuse or drug use on Rodney's part, and she stated that he has always worked hard to provide for his family. McLauchlin did not think her daughter was a good mother.

The record indicates that the trial judge spoke with Jackie in his office off the record. Section 14.07 of the family code provides:

> In a nonjury trial the court may interview the child in chambers to ascertain the child's wishes as to his conservator. Upon the application of any party and when the issue of managing conservatorship is contested, the court shall confer with a child 12 years of age or older and may confer with a child under 12 years of age, but in either event *the results of such interview shall not alter or diminish the discretionary power of the court.*

TEX.FAM.CODE ANN. § 14.07(c) (Vernon 1986) (emphasis added). Although we do not know the content of Jackie's conversation with the trial judge, even if Jackie had expressed a desire to live with his father, the court had the discretion to decide that this would not be in Jackie's best interest. The evidence is both legally and factually sufficient to support the court's decision to make Benita primary joint managing conservator. Point one is overruled.

## II. CHILD SUPPORT

■ In point two, Rodney argues that the evidence is insufficient to support the court's finding that he pay child support of $300 per month beginning April 1, 1993. The court's order states that Benita "shall have the exclusive right to establish [Jackie's] legal residence and school immediately following the completion of the spring, 1993, semester of the child's school." Rodney argues that it was clearly erroneous for the court to order him to pay child support to Benita at a time when Jackie was still living with him. He characterizes these payments as alimony, but does not cite any authority in support of his contentions.

■ Alimony after divorce is not permitted in Texas. *Eichelberger v. Eichelberger*, 582 S.W.2d 395, 402 (Tex.1979); *United States v. Stelter*, 567 S.W.2d 797, 798 (Tex. 1978); *Reed v. Reed*, 813 S.W.2d 716, 718 (Tex.App.—El Paso 1991, no writ). The term "alimony" has been defined to include allowance, whether periodical or in gross, judicially imposed on a husband to be made to his wife after divorce has been entered. *Reed*, 813 S.W.2d at 718.

We note that the Spring 1993 school semester could not have ended more than a couple of months after April 1, 1993. We cannot conclude that ordering child support payments to begin a short time before the recipient of the support has custody of the child constitutes alimony or is otherwise improper. The trial court could have determined that child support in advance of custody was necessary for Benita to prepare for Jackie's arrival. Rodney's second point of error is overruled.

## III. VALUATION AND DIVISION OF COMMUNITY PROPERTY

■ In points three through nine, Rodney challenges the court's valuation and/or distribution of various items of community property. A trial court has wide discretion in dividing property upon divorce, and its decision will be reversed on appeal only if there has been an abuse of discretion. *Murff v. Murff*, 615 S.W.2d 696, 698 (Tex.1981). The family code provides that the trial court

"shall order division in a manner that the court deems just and right, having due respect for the rights of each party and any children of the marriage." Tex.Fam.Code Ann. § 3.63 (Vernon 1993). In making a "just and right" property division, the court may consider, among other things, the parties' abilities, business opportunities, earning capacities, education, relative financial condition and obligations, the size of their separate estates, and the nature of the property. *Murff*, 615 S.W.2d at 699.

The record reflects the following regarding the parties' employment history: During the marriage, Rodney earned a living raising cattle and working in his mother's pawn shop. Benita earned an associate's degree from Tarrant County Junior College in pre-medicine. She never worked during the twenty-year marriage except for a year-and-a-half when she owned a convenience store, and two years when she worked at a pawn shop. She was working in a pawn shop in Lampasas at the time of trial.

### A. GUNS

■ Rodney contends in point three that the evidence is legally and factually insufficient to support the court's finding that the parties owned guns valued at $10,000. Benita testified that Rodney's gun collection was extensive and estimated that it was worth $10,000. Benita's father, Jackie Deaver, testified that one of Rodney's guns was worth $2,000, and that Rodney "had all kinds of hunting rifles and stuff all in a safe." Deaver, a hunter and former gun collector, also estimated that Rodney's guns were worth $10,000. Rodney himself appraised the guns at five to six thousand dollars. The evidence is legally and factually sufficient to support the court's finding. Point three is overruled.

### B. CATTLE

■ In points four and five, Rodney challenges the court's findings regarding cattle the parties owned. The court awarded Rodney all of the cattle and found that they were worth $90,731. The judge broke the $90,731 down as follows:

| | | |
|---|---|---|
| 16. | Cattle: | 37,600.00 |
| .... | | |
| 18. | 10 cows, calves: | 5,600.00 |
| 19. | 7 head of cattle, 3 calves: | 15,800.00 |
| 20. | One-half (½) interest in two (2) Keeford cows (per deposition of Rodney Cole): | 3,000.00 |
| .... | | |
| 22. | Value of additional cattle in possession of [Rodney] at the time of separation, which [Rodney] [sic], and for which there was no accountability of the funds: | 28,731.00 |

Rodney argues that the evidence is legally and factually insufficient to establish that the cattle were worth $90,731. He also disputes the court's finding that he sold $28,731 worth of cattle and cannot account for the funds.

In an inventory he prepared, Rodney indicated that he had ten cows and some calves worth $5,600. This is sufficient to support finding number eighteen.

Rodney also indicated on his inventory that he had $15,800 worth of Chianina cattle that he claimed belonged to Jackie, and $37,600 worth of Chianina cattle in Rodney, Jr.'s name. The parties disagreed about which cattle belonged to Rodney, Jr. and which were community property. It was Benita's position that Jackie did not have much interest in raising cattle. Based on findings sixteen and nineteen, the trial judge apparently did not believe that the Chianina cattle belonged to the children. As the trier of fact, the court was the sole judge of the credibility of the witnesses and the weight to be given their testimony. It had the discretion to find that Rodney was the owner of the cattle. The evidence is sufficient to support findings sixteen and nineteen.

Bill Phillips testified that he and Rodney each owned a half-interest in two Keeford cows. Rodney owed Phillips $3,000 for his share. This evidence is sufficient to support finding number twenty.

The only finding concerning cattle left for us to review is finding number twenty-two awarding Rodney $28,731.00, which represents cattle that were apparently sold but for which the proceeds were not accounted. Benita testified that about two days before she left home in June of 1992, Rodney told her they had 131 head of cattle. Rodney testified that in June and July 1992, shortly after he and Benita separated, he sold 53 cattle for

482

a total of $19,357.93. Rodney sold most of these cattle in his mother's name, even though she did not own them. Rodney testified that he did this because he owed his mother money. None of the proceeds from the sale of these cattle was deposited into the bank account Rodney used for his ranching operation. Rodney testified that he used this money to pay a debt to his mother and to pay bills. At the time of trial, Rodney had only ten cows left.

In his deposition, Rodney stated he owned thirty calves in July 1992. Of the cattle Rodney sold in July, only eight were calves. That leaves twenty-two calves unaccounted for, at an average price of $350 per calf, or a total of $7,700. This amount, combined with the money from the sale of the 53 cattle, is near the figure of $28,731. Given the testimony that the parties had 131 cattle at the time of separation, Rodney sold 53 a short time later, and only ten cattle remained at the time of trial, the evidence is sufficient to support the court's finding including this amount in its inventory of Rodney's property. Rodney's eighth point of error is overruled.

## C. DEBT TO RODNEY'S MOTHER

■ In his sixth point of error, Rodney asserts that the evidence is insufficient to support the court's finding that the community estate owed no debt to his mother, Mrs. C.W. Cole. In the divorce decree, the court ordered that as part of the division of the estate, Rodney shall pay a debt to his mother in the approximate amount of $185,000. In its findings of fact, the court states that the community estate owes no debt to Rodney's mother.

Rodney testified that he borrowed $180,000 from his mother to build the community homestead. *After he and Benita separated,* Rodney had an attorney draw up a deed of trust giving his mother a $189,000 lien on the house. The record indicates that Rodney produced the deed of trust at his deposition. But the record does not contain a copy of this document or any promissory note or other evidence of this debt to his mother. The court could have concluded that there was no loan or that Benita was not a debtor. *See Powell v. Powell,* 822 S.W.2d 181, 185 (Tex.

App.—Houston [1st Dist.] 1991, writ denied) (trial court did not err in releasing wife from liability for loan where evidence to prove loan existed was vague). Rodney's sixth point of error is overruled.

## D. MINERAL INTERESTS

In the divorce decree, the court awarded Rodney the real property, "save and except any and all mineral and/or royalty interests." In his seventh point of error, Rodney disputes the court's finding that the mineral and royalty interests owned by the parties have no significant value.

Two different interests are at issue. In its findings of fact, the court states that the "mineral and royalty interest owned by the parties has no significant value." The court also found that an "oil well royalty interest" has a value of $1,000. The Coles own a royalty interest, referred to as the "Ray Richie or the Barry No. 2 well," that pays them an average of $25 a month. Rodney did not think that this interest was worth more than $1,000. Benita also valued it at $1,000. The court also found that the royalty interest had a value of $1,000 and awarded that interest to Benita. Certainly the court's decision to value this interest at $1,000 is supported by legally and factually sufficient evidence.

■ Because the court placed a value of $1,000 on this royalty interest, we must assume that the court is referring to the other mineral interest involved in its finding that the parties' mineral interest has no significant value. Tommie Lee Graves and her now deceased husband sold the Coles the property on which they built their house. The Graveses reserved a mineral interest for a term of fifteen years. This interest passes to the Coles in 1999. According to Rodney, there is a producing well on the land, and Graves is making about $1,100 a month in royalties. The court could have concluded that the Coles' interest in the minerals that now belong to Graves is too speculative to appraise. Therefore, the court's finding that this interest has no significant value is supported by legally and factually sufficient evidence. We also note that as Rodney received the bulk of the community estate, we

cannot say that the court abused its discretion in awarding this mineral interest to Benita. Point seven is overruled.

### E. PAWN SHOP

In point eight, Rodney argues that there is insufficient evidence that Benita owned an interest in a business known as the River Oaks Pawn Shop. Rodney testified that his mother owns the pawn shop and he manages it. The disputed finding of fact states, "The court makes no finding on [Benita's] ... ownership interest or claim to the River Oaks Pawn Shop business, and any such interest is awarded 50/50 to each party. Mr. Cole's mother was not a party to the suit at the time of final hearing." The divorce decree, however, awards Rodney "[a]ny and all interest in the River Oaks Pawn Shop."

When there is a conflict between the judgment and the findings of fact, findings of fact filed after the judgment are controlling. *Bendele v. Tri–County Farmer's Co-op*, 635 S.W.2d 459, 469 (Tex.App.—San Antonio), *modified*, 641 S.W.2d 208 (1982); *Law v. Law*, 517 S.W.2d 379, 383 (Tex.Civ.App.—Austin 1974, writ dism'd). Here, the final divorce decree was filed on May 25, 1993, and the findings of fact were filed on June 29, 1993. The court's finding that awarded Benita a prospective interest in the business is therefore controlling. But it is not necessary to modify the judgment to conform to the findings of fact because we hold that there is no evidence to support the finding in question.

Appellant states in his brief that the "record is absolutely void of any evidence that indicates that either of the parties owns any interest in River Oaks Pawn Shop." Benita, on the other hand, argues that the court could have concluded that the pawn shop belonged to the community estate based on Rodney's involvement with the shop. Rodney testified that his mother allowed him to take items from the pawn shop for his and Benita's use. For example, Rodney used a riding lawn mower that belonged to the shop. He also testified that he took some jewelry from the shop for Benita to wear. He never returned the jewelry or paid the pawn shop for it and will have to reimburse the store.

Although Rodney's mother did not testify, Rodney read a statement apparently signed by her that said, "All merchandise, television and assorted jewelry in my son's possession belongs to River Oaks Pawn Shop." Benita testified that Rodney had given the jewelry in question to her as a gift and that "it [did] not belong to *his mother's* pawn shop." [Emphasis added.]

From our review of the record, ownership of the pawn shop does not even appear to be in dispute. There is no mention of the pawn shop in the "Proposed Property Distribution" Benita submitted to the trial court. Benita herself referred to the shop as "his mother's pawn shop."

We agree with Rodney that there is no evidence to establish that he or Benita had an ownership interest in the pawn shop. The evidence that Rodney manages the pawn shop and that he uses the shop's merchandise without paying for it does not amount to evidence of any ownership interest. Although the findings of fact state that the court made no finding concerning Benita's ownership of the pawn shop, the court found that if Benita has an interest in the business, it should be split between the parties. We note that the court did not place a value on these potential ownership interests or consider ownership of the pawn shop in distributing the community property.

Because the evidence is legally insufficient to support a finding that Benita or Rodney owned an interest in the pawn shop, the court erred in its finding that awarded Benita a potential interest and, as Rodney acknowledges in his brief, erred in awarding the pawn shop to Rodney in the judgment. Rodney's eighth point of error is sustained. We reverse in part the judgment awarding the pawn shop to Rodney. Because we partially remand this action on point of error eleven, we further direct the trial court on remand to reform the judgment by deleting its award to Rodney of "any and all interest in the River Oaks Pawn Shop."

### F. REAL ESTATE

Rodney contends in point nine that the evidence is insufficient to support the

court's finding that he and Benita owned real estate with a net value of $180,440. Rodney argues that the net value should have instead been between $118,000 and $120,000.

Pursuant to court order, Eva Earl Rutledge appraised the parties' residence and real property. Rutledge appraised the property at $300,000, which included the house, the eighty acres on which the house is situated, and numerous barns. She estimated that if the property sold for $300,000, closing costs would be about $35,000. She also stated that there were some problems with the house, and she would not be surprised if it sold for $250,000. According to Rutledge, the Coles owed about $4,300 in taxes on the property. Rutledge did agree that if the property sold for $250,000, the net value of the house would be between $118,000 and $120,000 after deducting closing costs, the amount mortgaged, and taxes. She thought that the house would need about $10,000 worth of work in order for the property to sell for $300,000.

From the findings of fact, it is apparent that the court arrived at the figure of $180,-440 by deducting the amount of the mortgage, $94,560, from $275,000. The court's $275,000 figure is within the evidence. Although Rutledge thought the net value of the house would be between $118,000 and $120,-000 if it sold for $250,000, she did not rule out the possibility that it could sell for more than $250,000. It is possible that the court started with the figure of $275,000 because it took into account the various deductions that would be made for closing costs and taxes. Rodney's ninth point of error is overruled.

## IV. LIEN ON COMMUNITY HOMESTEAD

■ The court ordered Rodney to execute a note payable to Benita for $176,378 to effect an equitable distribution of the community property and imposed an equitable lien on the homestead to secure the note. In point eleven, Rodney argues that the evidence is insufficient to support the court's finding that to effectuate a fair and equitable property division, he needed to execute a note secured by the community homestead. Rodney's actual complaint is that the court's

order violates the Texas Constitution. *See* TEX. CONST. art. XVI, § 50. He argues that a lien may not be imposed against a homestead to secure a note executed to effect an equitable division of community property.

■ The Texas Constitution specifically protects homesteads from forced sale except to satisfy liens securing purchase money, tax, or home improvement debts. TEX. CONST. art. XVI, § 50; *Heggen v. Pemelton,* 836 S.W.2d 145, 146 (Tex.1992). A lien may therefore be placed upon a spouse's homestead to secure payment of an amount awarded to the other spouse, but the amount secured is limited to the amount of the homestead interest awarded to the other spouse. *Smith v. Smith,* 836 S.W.2d 688, 693 (Tex. App.—Houston [1st Dist.] 1992, no writ); *Wren v. Wren,* 702 S.W.2d 250, 252 (Tex. App.—Houston [1st Dist.] 1985, writ dism'd); *Wierzchula v. Wierzchula,* 623 S.W.2d 730, 732 (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ).

In its findings of fact, the trial court carefully valued and distributed over twenty items of community property. Without taking the promissory note into consideration, the court awarded $348,956 worth of the community property to Rodney, and $11,500 worth of property to Benita. Regarding the cash payment, the court states the following in its findings of fact:

> To effect an equitable division of the community property, [Benita] would receive a Promissory Note, which note would be executed by [Rodney], payable to [Benita], in the original principal sum of $176,378.00, bearing interest at the rate of seven percent (7%) per annum, secured by a Deed of Trust upon the real property, including improvements, awarded to [Rodney].…

The court did not find that Rodney was to pay Benita $176,378 for her community interest in the homestead. It merely found that this payment was necessary to effect a fair and equitable distribution. We are unable to conclude that the note is solely to compensate Benita for her share of the homestead. Certainly a portion of the $176,378 reflects payment for Benita's interest in the community homestead. But it is possible, and in-

deed probable, that the note includes some compensation for Benita's interest in the other community assets awarded to Rodney.

In her brief, Benita asserts that this court can infer that the trial court awarded her all of the homestead and then had her sell it to Rodney in exchange for the note. But there is simply nothing in the record to support this interpretation of the court's actions. Point eleven is sustained.

With the exception of the point concerning the pawn shop, we have upheld the court's findings regarding property valuation, conservatorship, and child support. We therefore reverse and remand for a new trial for the limited purpose of distributing the community property.

In point ten, Rodney asserts that the court's finding that the property division in the decree was fair and equitable is not supported by legally and factually sufficient evidence. Because we are remanding this cause to the trial court, we need not consider this point as the court's distribution may not remain the same.

The judgment is affirmed in part and reversed and remanded in part.