

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00260-CV

D. PAUL PREVALLET                                                    APPELLANT

V.

RENA JANE PREVALLET                                                  APPELLEE

----------

## FROM THE 231ST DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

In seven issues, Appellant D. Paul Prevallet challenges portions of the divorce decree in favor of Appellee Rena Jane Prevallet. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Background

Paul and Rena were married on April 4, 1992. They had no children and lived together until Rena moved out on February 5, 2009. Paul subsequently filed for divorce, and Rena counter-petitioned seeking spousal support.

During a bench trial, the trial court heard evidence regarding the parties' property and Rena's disabilities. At the end of the trial, the trial court entered a decree of divorce dividing the community property, finding Rena disabled and eligible for spousal maintenance, and ordering Paul to pay Rena $1,150 per month indefinitely in spousal maintenance. Regarding the property at issue in this appeal, the decree states:

> IT IS ORDERED AND DECREED that the husband, D. PAUL PREVALLET, is awarded the following as his sole and separate property, and the wife is divested of all right, title, interest, and claim in and to that property:
>
> . . . .
>
> H-4. The funds on deposit, together with accrued but unpaid interest, in the following banks, savings institutions[,] or other financial institutions:
>
> Morgan Stanley, Account number ending in 9161.
>
> H-5. The sums, whether matured or unmatured, accrued or unaccrued, vested or otherwise, together with all increases thereof, the proceeds therefrom, and any other rights related to any profit-sharing plan, retirement plan, Keogh plan, pension plan, employee stock option plan, 401(k) plan, employee savings plan, accrued unpaid bonuses, disability plan, or other benefits existing by reason of the husband's past, present, or future employment save and except those awarded to Wife herein, as follows:
>
> . . . .

2

c. The Computer Sciences Corporation Employee Pension Plan and CSC Employee Pension Plan Frozen Salaried Benefit save and except that portion herein set aside to RENA JANE PREVALLET as more particularly described herein.

H-6. The individual retirement accounts, simplified employee pensions, annuities, and variable annuity life insurance benefits in the husband's name as follows:

      a. Wells Fargo Roth IRA Rollover, account number ending in 7430
      b. Wells Fargo IRA, account number ending in 7448

. . . .

H-8. The proceeds from the sale of Unit VK EAFE Select 20.

. . . .

IT IS ORDERED AND DECREED that the wife, RENA JANE PREVALLET, is awarded the following as her sole and separate property, and the husband is divested of all right, title, interest, and claim in and to that property:

. . . .

W-7. 50% of the community property interest in D. PAUL PREVALLET's retirement benefits in Computer Sciences Corporation Employee Pension Plan and CSC Employee Pension Plan Frozen Salaried Benefits arising out of D. PAUL PREVALLET's employment with CSC as of the date that this Agreed Final Decree of Divorce is signed by the Court, that portion being fifty percent, including any cost of living adjustments and any surviving spouse benefits, and more particularly defined in a Qualified Domestic Relations Order to be signed by the Court.

. . . .

W-9. The individual retirement accounts, simplified employee pensions, annuities, and variable annuity life insurance benefits in the husband's name being the Investacorp IRA.

In response to Paul's request, the trial court issued findings of fact that state,

      6. The Court finds that RENA JANE PREVALLET's monthly income is $1,681.21 and D. PAUL PREVALLET's monthly income is $10,811.

      7. The Court considered all relevant factors in determining the nature, amount, duration, and manner of periodic payments.

      8. During the marriage, Petitioner and Respondent acquired the following property other than by gift or inheritance with the values shown:

| ASSET | VALUE |
|---|---|
| . . . . | |
| 9. Investacorp (IRA) | $88,639.96 |
| 10. Morgan Stanley | $56,035 |

      The Court further finds that with regard to the Morgan Stanley account that the account consists of commingled separate property and community property and the Court further finds that D. PAUL PREVALLET did not establish by clear and convincing evidence D. PAUL PREVALLET's separate property interest in the Morgan Stanley account.

| | |
|---|---|
| 11. Computer Sciences Corporation Employee Pension Plan and CSC Employee Pension Plan Frozen Salaried Benefit | $34,000 |
| . . . . | |
| 13. Wells Fargo Roth IRA X7430 | $83,562.98 |

      The Court further finds that with regard to the Wells Fargo Roth IRA X7430 account that the account consists of commingled separate property and community property and the Court further finds that D.

4

PAUL PREVALLET did not establish by clear and convincing evidence D. PAUL PREVALLET's separate property interest in the Well's [sic] Fargo Roth IRA account.

. . . .

| | | |
|---|---|---|
| 15. | Wells Fargo IRA X7448 | $3,798.45 |
| 16. | Proceeds from VKEAFE | $90,132 |

. . . .

8. Based upon the equities in the case, including but not limited to the disparity in earning capacity of the parties and disability of RENA JANE PREVALLET, the Court finds that RENA JANE PREVALLET is entitled to an award of the following: The Court awards a judgment for attorneys's [sic] fees in favor of RENA JANE PREFVALLET [sic] against D. PAUL PREVALLET in the sum of $20,000 and bearing interest at the legal rate until paid in full.

This appeal followed.

### III. Discussion

In seven issues with multiple subissues, Paul complains that the trial court abused its discretion by awarding Rena attorney's fees and indefinite spousal maintenance; awarding to Rena his separate property in her award of half of the Computer Sciences Corporation (CSC) retirement account, all of the Investacorp IRA, the Wells Fargo Roth IRAs; the Morgan Stanley account, and the VKEAFE account; mischaracterizing the Wells Fargo Roth IRAs and VKEAFE account as community property in its findings of fact and conclusions of law because they were characterized as Paul's separate property in the decree; and prohibiting him from calling two rebuttal witness.

5

## A. Motion to Dismiss

Before submission, Rena filed with this court a motion to dismiss the appeal, in which she claims that Paul is estopped from appealing the trial court's judgment because he has accepted the benefits of the judgment. *See Waite v. Waite*, 150 S.W.3d 797, 803 (Tex. App.—Houston [14th Dist.] 2004, pet. denied).

In the decree, the trial court divested Rena of title to the parties' house and granted her an owelty lien for her portion of the parties' community property. Rena argues that Paul accepted the benefits of the decree by recording the decree and executing a new deed of trust on the parties' house, thus removing her as a record owner. However, neither party has contested this award on appeal, and because Paul has accepted a "part of the judgment that [Rena] concedes is due to [him]," *id.* at 803–04, we deny the motion and consider the merits of the appeal.

## B. Appeal

### 1. Standard of Review

All of the issues presented in this appeal are reviewed for an abuse of discretion. *See Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 235 (Tex. 2011) (holding that a trial court's ruling in admitting or excluding evidence is reviewed for abuse of discretion); *Mandell v. Mandell*, 310 S.W.3d 531, 538 (Tex. App.—Fort Worth 2010, pet. denied) (holding that divisions of marital property will not be reversed unless they are "so unjust and unfair as to constitute an abuse of discretion"); *Brooks v. Brooks*, 257 S.W.3d 418, 425 (Tex. App.—Fort Worth

6

2008, pet. denied) (holding that a spousal maintenance award is reviewed for an abuse of discretion).

A trial court abuses its discretion if it acts without reference to any guiding rules or principles, that is, if the act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

A trial court also abuses its discretion by ruling without supporting evidence. *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012). But an abuse of discretion does not occur when the trial court bases its decision on conflicting evidence and some evidence of substantive and probative character supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002) (op. on reh'g).

In family law cases, the abuse of discretion standard of review overlaps with the traditional sufficiency standard; thus, legal and factual sufficiency are relevant factors in our assessment of whether the trial court abused its discretion. *See Boyd v. Boyd*, 131 S.W.3d 605, 611 (Tex. App.—Fort Worth 2004, no pet.). Consequently, to determine whether the trial court abused its discretion because the evidence is legally or factually insufficient to support its decision, we conduct a two-pronged inquiry: (1) did the trial court have sufficient evidence upon which

7

to exercise its discretion, and (2) did the trial court err in its application of that discretion? *Id.*

## 2. Spousal Support

In his first issue, Paul complains that the trial court abused its discretion by awarding Rena indefinite spousal support based on her physical disability because she produced no probative evidence proving that she was unable to work. Paul specifically argues that Rena failed to prove that she was disabled, lacked earning capacity, or was unable to provide for her minimum reasonable needs without spousal support.

### a. Applicable Law

Family code section 8.051 provides that a trial court may award spousal maintenance if the spouse seeking maintenance "will lack sufficient property, including the spouse's separate property, on dissolution of the marriage to provide for the spouse's minimum reasonable needs" and the spouse seeking maintenance "is unable to earn sufficient income to provide for the spouse's minimum reasonable needs because of an incapacitating physical or mental disability." Tex. Fam. Code Ann. § 8.051(2)(A) (West Supp. 2012). A trial court determines a spouse's "minimum reasonable needs" on a case-by-case basis. *See Diaz v. Diaz*, 350 S.W.3d 251, 254 (Tex. App.—San Antonio 2011, pet. denied) (op. on reh'g). Among the factors that the trial court may consider in determining spousal maintenance are "each spouse's ability to provide for [his or her] minimum reasonable needs independently, considering the spouse's

8

financial resources on dissolution of the marriage," and "the age, employment history, earning ability, and physical and emotional condition of the spouse seeking maintenance." Tex. Fam. Code Ann. § 8.052(1), (4) (West Supp. 2012).

Further, section 8.054 states that a trial court should limit the duration of a spousal maintenance order to the shortest reasonable period unless the spouse's ability to provide for her minimum reasonable needs is "substantially or totally diminished" because of a "physical or mental disability." *Id.* § 8.054(a)(2)(A) (West Supp. 2012). And a trial court may order maintenance for a spouse who qualifies under section 8.051(2)(A) "for as long as the spouse continues to satisfy the eligibility criteria prescribed by the applicable provision." *Id.* § 8.054(b) (West Supp. 2012).

The decree in this case states,

> The Court finds that under the circumstances presented in this case, RENA JANE PREVALLET is disabled, the result of which is RENA JANE PREVALLET's ability to provide for her minimum reasonable needs is substantially diminished, and RENA JANE PREVALLET is eligible for maintenance under the provisions of Texas Family Code chapter 8. Accordingly, IT IS ORDERED AND DECREED that D. PAUL PREVALLET is ordered to pay as maintenance the sum of $1,150.00 per month to RENA JANE PREVALLET . . . until the death of RENA JANE PREVALLET or further order of this Court affecting the spousal maintenance obligation.

The trial court stated in its findings of fact,

> 4. The duration of the marriage was ten years or longer; RENA JANE PREVALLET lacks sufficient property, including property distributed to her in the divorce, to provide for her minimum reasonable needs; RENA JANE PREVALLET is unable to support herself through appropriate employment because of an incapacitating physical disability; RENA JANE PREVALLET is

9

disabled as set forth in Texas Family Code Section 8.054 and the result of which is RENA JANE PREVALLET's ability to provide for her minimum reasonable needs is substantially diminished.

5.    RENA JANE PREVALLET has an incapacitating physical disability.

### b. Evidence

Rena testified that she was disabled; that she had myasthenia gravis, fibromyalgia, myofacia disease, and a thyroid disorder; and that her sole monthly income consisted of $1,458 in social security disability and $170.21 in MetLife long-term disability payments. She also introduced physician's statements from 2001, 2002, 2003, 2004, 2008, 2009, 2010, and 2011 that included diagnoses of myasthenia gravis, fibromyalgia, and myofacia disease. These statements all indicate that Rena is totally disabled with no recovery expected. Rena also introduced a January 29, 1999 Social Security Administration decision in which the administration found Rena disabled and stated that "there are no jobs existing in significant numbers which [she] can perform." She also testified that she takes Ultram for neck, arm, and back pain but that her neck pain has subsided since her surgery in 2007. She stated that she still has a "low pain" due to fibromyalgia.

Paul testified that Rena had been working as an administrative director of a local charity despite her disability. Rena confirmed that she had volunteered with the HALO Society on four occasions in 2011 and that her activities involved sending e-mails, conducting phone conversations, and shopping for and

10

delivering goods to foster families. She testified that as of October 2011, she had worked ten or less hours at HALO and that she was able to volunteer with HALO because she could work at her own pace.

Paul also contested Rena's disability at trial by offering pictures of her on a 2008 trip to Peru. Among the pictures are several depicting Rena at Machu Picchu. Paul claimed that these pictures showed that Rena's disability was not severe enough to preclude her from working. Rena testified, however, that the pictures only showed her standing, sitting, and riding a bus; that she did no hiking on the trip; and that she spent some days in bed because she was too sick to go sightseeing.

Regarding her income and expenses, Rena offered into evidence a record of her monthly expenses that totaled $4,033.77. On cross-examination, Rena agreed that this sum could be reduced by about $1,000, which produced a value below that stated on her temporary orders expense statement. Specifically, Rena agreed that she could reduce her phone, cable, and grooming expenses, and eliminate charitable and other gift giving. The trial court noted in its findings of fact and conclusions of law that Rena's monthly income was $1,681.21 and Paul's monthly income was $10,811.

### c. Analysis

Paul contends that Rena's disability is not so severe as to prevent her from obtaining employment sufficient to meet her minimum reasonable needs and that there is no evidence in the record as to why Rena cannot work. As a baseline for

assessing the degree of Rena's disability, Paul cites *Brooks*, 257 S.W.3d at 425, and argues that Rena's condition pales in comparison to that of the wife in *Brooks*.

In affirming the trial court's spousal maintenance award in *Brooks*, we noted that the wife presented no expert testimony and introduced no medical records but only testified to her deteriorating health. *Id.* (citing *Pickens v. Pickens*, 62 S.W.3d 212, 215–16 (Tex. App.—Dallas 2001, pet. denied), for the proposition that expert testimony is not needed to prove incapacity). The wife testified that she had "three discs on her back 'that were out,'" was taking epidural steroid injections that affected her ability to work, had osteoporosis that left her bones so brittle that she could not work, and that she had an unidentified mass on her hip. *Id.* She stated further that her parents supported her and that her only job during the six years preceding trial involved assisting an elderly woman by running errands and taking her to the doctor. *Id.*

Both Rena and the wife in *Brooks* testified that they had a permanent disability that prevented them from working. *See id.* Also like the wife in *Brooks*, Rena manages to perform some tasks outside of the home despite her disability. *See id.* However, unlike the wife in *Brooks*, Rena introduced numerous physician statements that declared her permanently and totally disabled and a Social Security judgment that found "no jobs existing in significant numbers [that she] can perform." *See id.*

12

While acknowledging the disparity in Rena's income and expenses, Paul argues that she could have used the assets that she was awarded in the decree to cover the income shortfall and pay for her minimum reasonable needs. As noted by Rena, however, the majority of the assets awarded to her are long-term assets with tax consequences discouraging liquidation, and the liquid assets awarded to her total only about $12,000. Further, a spouse is not required to exhaust all nonliquid assets to qualify for spousal maintenance. *See Dunaway v. Dunaway*, No. 14-06-01042-CV, 2007 WL 3342020, at *3 (Tex. App.—Houston [14th Dist.] Nov. 13, 2007, no pet.) (mem. op.) (holding that a spouse is not required to "spend down long-term assets, liquidate all available assets, or incur new debt simply to obtain job skills and meet needs in the short term"); *In re Marriage of McFarland*, 176 S.W.3d 650, 659 (Tex. App.—Texarkana 2005, no pet.) (holding that wife was not required to liquidate her retirement account, which was her primary asset, to meet her minimum needs).

Based on the foregoing, we hold that the trial court did not abuse its discretion by finding that Rena had a physical disability that substantially diminished her ability to provide for her minimum reasonable needs and by ordering Paul to pay indefinite spousal maintenance. *See Boyd*, 131 S.W.3d at 611. We overrule Paul's first issue.[2]

---

[2]In a subissue, Paul argues that the trial court abused its discretion by awarding Rena attorney's fees in addition to spousal support. However, Paul cites no legal authority and provides no analysis to support his argument that the

13

### 3. Property Division and Characterization

In a divorce decree, the trial court must divide the parties' estate "in a manner that the court deems just and right, having due regard for the rights of each party." Tex. Fam. Code Ann. § 7.001 (West 2006). Both the state constitution and the family code provide that a spouse has a separate property interest in all property "owned or claimed before marriage" or "acquired afterward by gift, devise or descent" during the marriage. Tex. Const. art. XVI, § 15; Tex. Fam. Code Ann. § 3.001 (West 2006). Community property is all other property acquired by either spouse during the marriage. Tex. Fam. Code Ann. § 3.002 (West 2006). All property "possessed by either spouse during or on dissolution of marriage is presumed to be community property," and clear and convincing evidence is required to defeat this presumption. *Id.* § 3.003 (West 2006). Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *Id.* § 101.007 (West 2008); *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012); *State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010). Generally, "mere testimony that property was purchased with separate funds, without any tracing of the funds, is insufficient to rebut the community presumption." *Irvin v. Parker*, 139 S.W.3d 703, 708 (Tex. App.—Fort

---

trial court should have considered its spousal maintenance award when considering whether to also award attorney's fees. Thus he has waived this argument on appeal. *See* Tex. R. App. P. 38.1(i).

Worth 2004, no pet.) (citing *Boyd*, 131 S.W.3d at 612). Doubts as to the character of property are resolved in favor of the community estate. *Id.*

### a. The Investacorp IRA

In part of his second issue, Paul complains that the trial court abused its discretion by awarding his entire Investacorp IRA to Rena, arguing that the entire account was his separate property.

Paul testified that he participated in two plans while working for General Dynamics and CSC—a pension plan and a 401(k) plan. He began working for General Dynamics in 1988 and rolled over "around $8,000" from his previous retirement account into his 401(k) when he started at General Dynamics. CSC "bought out all the employees" in 1991. Paul stated that he contributed to the CSC "401(k) plan" from the time he started working for CSC until he and Rena married on April 4, 1992. When asked how much he thought was in the account on the date of marriage, Paul said, "I think $23,000." He left CSC in May 2004 and testified that he rolled the 401(k) into the Investacorp account at that time. Paul offered no documentation showing the balance in the account on April 4, 1992, and claimed that Rena had shredded the documents as a matter of practice. When asked by the trial court whether he had attempted to obtain documentation from CSC, Paul stated that he had not attempted to do so

although CSC is still in business.[3]  During cross-examination, Rena's attorney asked, "So we don't know how much you rolled over, if any, isn't that correct, Mr. Prevallet?"  Paul replied, "Yes."  Paul offered into evidence a September 2011 Investacorp statement showing a balance of $88,639.96.  The Investacorp statement shows a local phone number for questions.

The only evidence contained in the record as to the source of this account is Paul's testimony that the money in this account was rolled over from his CSC 401(k).  This, however, is insufficient alone to trace the source of the account and prove by clear and convincing evidence that it was Paul's separate property. *See Irvin*, 139 S.W.3d at 708.  Because we resolve any doubts as to the character of property in favor of the community estate, we hold that the trial court did not abuse its discretion by characterizing the Investacorp IRA as community property. *Id.*  We overrule this portion of Paul's second issue.

---

[3]Petitioner's Exhibit 39, listed in the record as "Paul's CSC Pension Explanation," is a letter dated June 16, 2004.  It states, "Enclosed you will find two (2) estimated statements of account from the CSC Employee Pension Plan. . . .  In order to initiate your retirement benefit on a timely basis, please notify us 90 days prior to your elected retirement date so that we may provide you with current benefit options and the necessary forms. . . .  If you have any questions, please contact CSC Retirement Plans Department."  The letter includes a phone number and email address to ask questions.

### b. The Wells Fargo Roth IRAs

In his third issue, Paul complains that the trial court abused its discretion by characterizing the Wells Fargo Roth IRAs as community property because the accounts were created and funded before the marriage by Paul's father and intended as a gift to Paul.

At trial, Paul testified that his father had set up a Wells Fargo IRA when Paul was seventeen and that Paul had never contributed any money to the account. Rena stipulated that the account existed before the parties married but disputed whether the community estate obtained an interest in the account during the marriage.

Paul's father testified that he set up the account when Paul was seventeen, that he alone contributed funds to the account, and that Paul had never taken any money out of the account. He also testified that the account was rolled over to two Roth IRAs in 1997 and that the accounts were intended to benefit only Paul. Paul's father testified that although he made annual contributions to the accounts, Paul deducted the contributions from his federal taxes because the accounts were in his name. Paul and Rena filed their federal taxes separately.

Paul introduced account statements from 2000 through 2010, all of which list Paul as the account owner. Additionally, the statements reflect that at least

17

some dividend payments were reinvested in the accounts and that cash and securities had been deposited on several occasions.[4]

Although Rena stipulated that the Wells Fargo IRAs were created before the marriage, the record indicates that community and separate property were commingled in the accounts. *See In re Marriage of Born*, No. 06-08-00066-CV, 2009 WL 1010876, at \*2 (Tex. App.—Texarkana Apr. 16, 2009, no pet.) (mem. op.) (holding that cash dividends from separately held mutual funds are community property); *Hendershot v. Hendershot*, No. 02-07-00298-CV, 2008 WL 4445648, at \*5 n.4 (Tex. App.—Fort Worth Oct. 2, 2008, no pet.) (mem. op.) ("When separate property produces income and that income is acquired by a spouse, it is community property."). Additionally, the only evidence contained in the record as to the source of the cash and securities deposited into the accounts during the parties' marriage is the testimony of Paul and his father. This alone is insufficient to rebut the community property presumption. *See Irvin*, 139 S.W.3d at 708 (holding that mere testimony without tracing is insufficient to rebut the community property presumption). Consequently, we hold that the trial court did

---

[4]Paul attempted to introduce a spreadsheet that his father had prepared to show the historical account balance, contributions, dividend income, and community and separate property interests in the accounts. Rena objected to the spreadsheet as not reflecting the fact that all income received during the marriage was classified as community property, and the trial court sustained her objection. Paul does not raise the exclusion of this evidence as an issue.

18

not abuse its discretion by finding that the Wells Fargo IRAs were community property. *Id.* We overrule Paul's third issue.

### c. The Morgan Stanley Account

In his fifth issue, Paul complains that the trial court abused its discretion by characterizing the Morgan Stanley account as community property when it was created and funded by his father and contained no commingled funds.[5]

At trial, Paul testified that the Morgan Stanley account was established by his father and that he had never contributed any money to it or withdrawn money from it. However, he admitted that he had reported the account on his federal income tax return and that his father would reimburse him each year for the taxes he paid on the account. Again, Paul and Rena filed federal taxes separately. Paul's 2010 federal income tax return—admitted as proof of Paul's income—showed interest and dividends reported from Morgan Stanley. Paul testified that the money in the account was his father's and that there was never any intention that it be shared with Rena. He also said that his father had set up this account

---

[5]Paul also argues that this account was at the same time owned by his father and a gift from his father. A gift, however, requires that the donor deliver the property to the donee. *See Williams v. Williams*, No. 02-08-00033-CV, 2008 WL 5194227, at \*4 (Tex. App.—Fort Worth Dec. 11, 2008, no pet.) (mem. op.). We do not reach this argument because Paul has failed to prove by clear and convincing evidence that the account was his separate property. *See* Tex. Fam. Code Ann. § 3.003; *Williams*, 2008 WL 5194227, at \*4 (holding that the party claiming property as a gift must prove the gift by clear and convincing evidence); *see also* Tex. R. App. P. 47.1.

before Paul married Rena. On cross-examination, Paul admitted that he did not list the Morgan Stanley account on his inventory.

Rena offered 1099 statements from Morgan Stanley for tax years 2003 through 2008 that were addressed to Paul and his parents at his parents' address. The statements list Paul's social security number as the taxpayer ID and reflect dividend distributions and interest income paid from the account.

Paul's father testified that he owned the Morgan Stanley account and that the money in the account came from his parents' estate. He also testified that Paul had never taken money from the account but said that he added Paul to the account so that Paul could access the money in case of a family emergency. Paul's father also testified that he had no intention of sharing the money with Rena and that Paul had no ownership interest in the account. He also testified that Paul paid the income tax on the interest earned on the account and that he reimbursed Paul each year for the tax paid.

The only evidence in the record as to the source of the money in the Morgan Stanley account was Paul's and his father's testimonies. This evidence alone is insufficient to rebut the presumption that this account was part of the community estate. *See id.* Further, the 1099s and Paul's tax return indicated that Paul was the taxpayer on the account and that Paul paid taxes on the income from the account. Consequently, we hold that the trial court did not

abuse its discretion by finding the Morgan Stanley account community property. *Id.* We overrule this portion of his fifth issue.[6]

As a subissue, Paul argues that the trial court abused its discretion by awarding the VKEAFE account to Rena. Specifically, Paul argues that the account was a capital gain from the previously discussed Morgan Stanley account and should have been characterized as Paul's separate property.

After carefully examining the decree, we find no such award. The only mention of this account in the decree states that "[t]he proceeds from the sale of Unit VK EAFE Select 20" are awarded to Paul as "his sole and separate property." Further, the record contains no evidence that the VKEAFE account was associated with the Morgan Stanley account. The only evidence regarding this account reflected in the record is Paul's testimony that he did not include the account on his inventory because it was his father's money and Paul's 2010 federal income tax return listing the account on the short-term capital gains and losses schedule. Consequently, we overrule this portion of Paul's fifth issue. *See Low*, 221 S.W.3d at 620.

---

[6]As a subissue, Paul complains that the trial court divested his father of his interest in the Morgan Stanley account by characterizing it as community property. However, Paul has no standing to complain of his father's loss. *See Nootsie, Ltd. v. Williamson Cnty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996) (holding that a person has standing to sue when he is personally aggrieved by the alleged wrong); *Cadle Co. v. Lobingier*, 50 S.W.3d 662, 669–70 (Tex. App.—Fort Worth 2001, pet. denied) (op. on reh'g) (holding that an individual has standing to litigate only when a legal right belonging to the individual has been breached).

21

### d. The CSC Pension Plan

In the remainder of his second issue, Paul complains that the trial court abused its discretion by awarding half of his CSC pension plan to Rena. Paul argues that the trial court erred by not allocating to him the portion of the CSC pension plan that accrued before he and Rena married, thereby divesting him of his separate property.

The trial court admitted into evidence two November 19, 2009 CSC Employee Pension Plan account statements that listed November 2, 1991 as the date on which Paul entered the plan and showed a May 21, 2004 account balance of $28,121.01. The statements estimated the value of the account as $67,425.86 on March 1, 2017 (based on $39,304.85 in interest), and $109,829.62 on March 1, 2027 (based on $81,708.61 in interest).

Paul testified that he entered the plan when he started working for General Dynamics in 1988 and that the November 2, 1991 date on the statements was the date that CSC took over and transferred his plan from General Dynamics. While Paul said that he thought $23,000 had been rolled over from General Dynamics into his CSC plan, he also said that a "very small portion" of the account contained his separate property interest from the time before the parties' April 1992 marriage. Paul asked the trial court to award Rena half of the value of his CSC pension account that had accrued during the marriage.

The trial court admitted Rena's amended proposed property division. That proposal valued the plan at $28,121 "plus estimated interest from 5/21/04:

22

$6,000," for a total of $34,121. The trial court found that the community interest in the plan was $34,000 and divided it 50/50 between the parties.

As Paul notes in his brief, calculating the community property interest in a defined benefit plan such as his CSC pension plan requires applying the formula from *Berry v. Berry*, 647 S.W.2d 945, 947 (Tex. 1983). *See Boyd v. Boyd*, 67 S.W.3d 398, 407 (Tex. App.—Fort Worth 2002, no pet.) (citing *Berry*, 647 S.W.2d at 946–47). Paul's documents show that he contributed to the plan for five months prior to marriage.[7] Based on the record before us and the language used by the trial court in its judgment and findings of fact and conclusions of law, it appears that the trial court applied the *Berry* formula to the plan's value at the date of divorce, which it could have extrapolated from Rena's proposed property division and Paul's documents, for the following calculation: (number of months married under plan/ number of months employed under plan at date of divorce) x (value of plan at date of divorce), or 145/150 x $35,172.29,[8] to reach a community share of $34,000, which it then divided according to Paul's request.

[7]While Paul argues that his testimony supports measuring the separate property portion of the CSC retirement plan from 1988, his testimony without any supporting documentary evidence is insufficient to meet the clear and convincing standard and his testimony that $23,000 was rolled into the plan prior to marriage is likewise insufficient. *See Graves v. Tomlinson*, 329 S.W.3d 128, 139 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

[8]Paul does not appear to dispute the community value found by the trial court except to complain that it did not consider his separate property interest in reaching that amount. He also did not provide at trial any evidence about interest rates and has not provided us with any calculations in his briefing.

*See id.* Because we ascertain no abuse of discretion on this record, we overrule the remainder of Paul's second issue.

### e. Decree and Findings of Fact Discrepancies

In his fourth issue, Paul complains that the trial court abused its discretion by characterizing the Wells Fargo IRAs as community property in its findings of fact and conclusions of law while characterizing them as Paul's separate property in the decree. In his sixth issue, Paul makes this same complaint with regard to the VKEAFE account.

At the outset, we note that the decree did not characterize the parties' property but awarded property to the parties. *See* Tex. Fam. Code Ann. § 7.001. No separate property was confirmed as such in the decree.

Paul cites *Cole v. Cole*, 880 S.W.2d 477, 483 (Tex. App.—Fort Worth 1994, no writ), for the proposition that we need not modify the judgment when it is in conflict with the trial court's findings of fact because findings of fact filed after the judgment are controlling and that we should remand the case to the trial court for clarification. However, *Cole* is inapposite to this case because there is no conflict between the decree and the trial court's findings of fact.

In *Cole*, the trial court stated in its findings of fact that although it made no finding of ownership in the property in question, "any such interest is awarded 50/50 to each party." *Id.* The decree, however, awarded all of the property in question to the appellant. *Id.* Thus, the decree and the trial court's findings of fact were in direct conflict. *Id.*

24

As stated above, the decree in this case *awarded* the Wells Fargo IRAs and the VKEAFE account to Paul as his separate property. In its findings of fact and conclusions of law, however, the trial court found that these accounts were acquired during the marriage other than by gift or inheritance. The trial court specifically noted in its findings of fact and conclusions of law that one of the Wells Fargo IRAs consisted of commingled funds and that Paul had failed to prove by clear and convincing evidence that the account was his separate property. Because the trial court could have awarded all of the community interest in these accounts to Paul, the decree and the trial court's findings of fact and conclusions of law are not in conflict. *See* Tex. Fam. Code Ann. §§ 3.003, 7.001. We overrule Paul's fourth and sixth issues.

### 4. Paul's Rebuttal Witnesses

In his seventh issue, Paul complains that the trial court abused its discretion by preventing him from calling two rebuttal witnesses.

At trial, Paul attempted to call Rena's ex-husband to testify. Rena objected that the witness was not listed on Paul's witness list and the trial court sustained her objection and struck the witness. In his offer of proof, Paul's attorney stated that she needed to call the witness because "[t]here was [sic] some items left out of the discovery that we did not realize based on the way that a court document reads until Saturday when I met with my client. He may be properly a rebuttal witness later on in the case."

25

If error occurs in the exclusion of evidence, the appellant must present a formal bill of exception to the trial court unless the substance of the excluded evidence was apparent from the context within which the questions were asked. Tex. R. App. P. 33.2; Tex. R. Evid. 103(a)(2); *see also Bowman v. Patel*, No. 01-10-00811-CV, 2012 WL 524428, at *3 (Tex. App.—Houston [1st Dist.] Feb. 16, 2012, no pet.) (mem. op.) (holding that preserving error when testimony is excluded requires that the appellant "clearly inform the trial court of the subject matter about which it wants to examine the witness").

Paul argues on appeal that he called Rena's ex-husband to testify about retirement benefits that Rena would receive when her ex-husband retired. However, he made no such statement in his offer of proof to the trial court, and his offer of proof offers no insight into the subject matter of the witness's proposed testimony. *See Bowman*, 2012 WL 524428, at *3. Thus, Paul has failed to preserve this issue for our review. *See* Tex. R. App. P. 33.2.

Paul also intended to call Bud Starnes to rebut the testimony of James Handy, who testified to the value of the parties' home. Paul called Handy on direct examination and asked him about an appraisal of the parties' home that he had prepared in 2010. When asked whether he had updated his appraisal, Handy stated that he had updated it on October 11, 2011—six days before trial—and that the value had not changed. When Starnes later entered the courtroom, the following exchange occurred:

THE COURT: Is this another of your witnesses?

[COUNSEL]:  Yes, Your Honor.

THE COURT:  All right.  If he's not been listed, he's not going to testify.

[COUNSEL]:  He's a rebuttal witness because of yesterday's testimony by Mr. Handy.  He's a Realtor.

THE COURT:  [Counsel], Mr. Handy's—Mr. Handy's opinion has been no different than what it was in his report and that report has been on file—has been available for some months.  Just to name a person rebuttal witness and failing to comply with discovery is not proper.  If you intended to call this witness, you've known that you were going to call this witness for some time.

[COUNSEL]:  Sir, I did not expect that Mr. Handy would not adjust for the change in the market in his opinion from the original letter a year ago.

THE COURT:  Well, [Counsel], that should have been anticipated and if you were going to have a witness, obviously, you knew the witness before time of trial and did not even put that witness in your witness list.

In his offer of proof, Paul stated that he had not anticipated that Handy would testify to his original appraisal because his pretrial investigation showed that comparative sale prices had changed since that appraisal.  Paul claimed that he had intended to call Starnes for an additional opinion in response to Handy's testimony.

We must uphold the trial court's evidentiary ruling if there is any legitimate basis in the record for the ruling.  *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).  Given that Paul verified Handy's appraisal before trial and arrived at a different value, we hold that he should have anticipated that

he might need to call Starnes to counter Handy's testimony. *See Moore v. Mem'l Hermann Hosp. Sys., Inc.*, 140 S.W.3d 870, 875 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (holding that appellant should have anticipated the need for a rebuttal witness because she was aware of appellee's expert's opinion). Thus, the trial court did not abuse its discretion by excluding Starnes's testimony. *See id.* We overrule Paul's seventh issue.

## IV. Conclusion

Having overruled Paul's dispositive issues, we affirm the trial court's judgment.

BOB MCCOY
JUSTICE

PANEL: GARDNER, WALKER, and MCCOY, JJ.

DELIVERED: January 9, 2014