# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH
## NO. 02-12-00369-CV


PEGGY M. BLACKBURN                                    APPELLANT

V.

GILDEN B. BLACKBURN                                    APPELLEE

----------

FROM THE 43RD DISTRICT COURT OF PARKER COUNTY
TRIAL COURT NO. CV06-0012

----------

## MEMORANDUM OPINION[1]

----------

In nine issues, Appellant Peggy M. Blackburn appeals from the trial court's "Order on Petition for Breach of Contract, Conversion, Division of Property and Motion for Enforcement of Mediated Settlement Agreement and Third-Party Petition; on Petition in Intervention for Attorney's Fees; and Construing Mediated

---

[1]*See* Tex. R. App. P. 47.4.

Settlement Agreement for Final Distribution of Assets." We affirm the trial court's judgment as modified.

## I. Background Facts

Peggy and Appellee Gilden B. Blackburn (Gil) were married in November 1978. Peggy filed for divorce on January 5, 2006, and Gil filed a counter-petition for divorce shortly thereafter. Gil and Peggy had four children; at the time of the divorce proceedings, only one of the children was under the age of eighteen. Now, none are.

### A. Temporary Orders

On November 6, 2006, the trial court entered agreed interim orders finding that Gil's net monthly income was $31,237.50 and ordered that "[a]fter payment of the community mortgage payment on the Ranch, the parties will each receive one-half of the total net income." The trial court further ordered that Gil pay $12,295.75 per month to Peggy beginning retroactively on August 15, 2006, and that any other income Gil received would be split equally between the parties. The agreed interim orders also temporarily awarded certain personal and real property to the parties, and ordered each party to pay certain debts and expenses.

On January 4, 2007, Peggy moved to modify the agreed interim orders and for additional temporary orders, requesting that Gil be ordered to pay $13,957.79 per month because the mortgage payment used to calculate the $12,295.75 monthly payment in the November 2006 order was incorrect. Peggy also

2

requested that Gil be ordered to pay $8,310.20, the amount she claimed was owed as a result of Gil paying the incorrectly-calculated amount from August through December 2006. On January 30, 2007, the parties reached an agreement on Peggy's motion to modify temporary orders and for additional orders. An agreed order on Peggy's motion was not entered by the trial court until March 14, 2007.

In April 2007, Peggy filed a motion to enforce the November 2006 temporary orders and the 2007 temporary orders. Peggy asserted that Gil had violated the modified temporary orders by paying the incorrect monthly amount stated in the original agreed interim orders. Gil apparently filed a competing motion to enforce temporary orders. The trial court found that both parties had violated the temporary orders but did not find that Gil had failed to make his required monthly payments of $13,957.79. Instead, the trial court found that Gil had failed to equally divide additional income he received from August 2006 to April 2007 and consequently ordered that Gil pay $5,849.00 to Peggy.

### B. Mediation and Oral Pronouncement of Divorce

The parties mediated their divorce on February 8, 2007. At the conclusion of the mediation, they entered into a mediated settlement agreement (MSA) that delineated and divided their property and set forth the conservatorship and support of their minor child. The MSA stated that it was "a full and complete settlement of all of the issues in this case" and that "[t]he Parties hereby release each other from any and all claims, plead or unplead, that may exist between

3

them on today's date." Relevant to this appeal, the parties agreed in the MSA that Gil would pay Peggy $1,087,500 in eighty-seven monthly payments of $12,500 on the fifteenth of each month beginning the first month after the divorce. The parties agreed that this obligation was to be "secured by the Schwab account and [Gil's] disability income checks." The parties also agreed to divide the "Golden Triangle Limited Partnership Apartment Complex," which was valued at $150,000, equally and to divide a Charles Schwab IRA account owned by the parties (the 1608 account), which was valued at $4,189,080, with Gil receiving $2,689,080 from the account and Peggy receiving $1,500,000. The parties also agreed that Gil would pay Peggy $1,200 per month in child support.

The MSA was filed with the trial court on February 9, 2007. On February 22, 2007, Peggy appeared before the trial court to prove up the MSA. Peggy testified that she and Gil had mediated the case and had signed the MSA, and she asked the trial court to approve the MSA and grant the divorce. At the conclusion of the hearing, the trial court stated, "All right. I'm going to grant the divorce pursuant to the terms and provisions of the [MSA] that's been stated herein today, and I will sign the Decree upon presentment."

On April 13, 2007, Peggy filed a motion to sign a final decree of divorce and apparently submitted a proposed decree to the trial court. (That proposed decree is not attached to the motion in the clerk's record.) Gil objected to the entry of the proposed decree, claiming that the MSA failed as an agreement because it referenced a rule 11 agreement and an exhibit that did not exist, failed

4

to comply with the requirements of family code section 6.602, and failed to divide all of the parties' property and debts.[2]  Alternatively, Gil repudiated the MSA to the extent that it was found to exist.  In response, Peggy argued that the MSA complied with section 6.602 and divided all the parties' assets and liabilities.  She further stated that "the MSA demonstrates that the parties have entered into a comprehensive settlement agreement which finally resolves their competing claims for divorce and child custody and leaves no remaining issues for a trial on the merits."

### C.  July 2007 Divorce Decree

On July 25, 2007, the trial court signed a final decree of divorce.  The decree provided in relevant part as follows:

**Agreement of Parties**

>        The Court finds that the parties have entered into a written agreement as contained in this decree by virtue of having approved this decree as to both form and substance.  The Court approves the agreement of the parties as contained in this Final Decree of Divorce.

>        The Court finds that the parties have entered into an Agreement Incident to Divorce [(AID)], in a document separate from this Final Decree of Divorce.  The Court approves the agreement and incorporates it by reference as part of this decree as if it were recited herein verbatim and orders the parties to do all things necessary to effectuate the agreement.  A copy of the agreement is filed with the records of this Court and the Court is allowing the original to be kept by [Peggy's attorney].

---

[2] *See* Tex. Fam. Code Ann. § 6.602 (West 2006).

5

The agreements in this Final Decree of Divorce were reached in mediation with [Mediator]. This Final Decree of Divorce is stipulated to represent a merger of a [MSA] between the parties. To the extent there exist any differences between the [MSA] and this Final Decree of Divorce, this Final Decree of Divorce shall control in all instances.

. . . .

**Division of Marital Estate**

The Court finds that the parties have reached an agreement as to the division of their marital estate and it is set forth in the [AID]. The Court has reviewed such [AID] and finds that it is just, right and reasonable and approves the same, and hereby incorporates the [AID] as set out verbatim in this Final Decree of Divorce, and further finds that such [AID] is enforceable as a judgment or a contract, as provided by law.

. . . .

**Date of Judgment**

This divorce was judicially PRONOUNCED AND RENDERED in court at Weatherford, Parker County, Texas, on February 22, 2007 and further noted on the court's docket sheet on the same date, but signed on July 25, 2007.

On August 29, 2007, Peggy filed a motion requesting the trial court to order the parties to sign an AID, stating that the most contested issue in the AID was the award of a $1,087,500 judgment in her favor against Gil. Peggy argued that under the terms of the MSA, the eighty-seven monthly payments were to begin on August 15, 2007, and end on October 15, 2014, not May 2014. Peggy also requested that the trial court modify the account apportionment values provided in the MSA because more current information was available; the account information in the MSA was more than six months old. The trial court

granted the motion in part, holding that the payments began August 2007 and would end November 2014, but the trial court did not modify the account apportionment values. Gil objected to the order and requested a new trial, arguing that the divorce was effective February 22, 2007, and that it therefore dissolved the temporary orders and put the terms of the MSA into effect. Gil contended that the July 2007 decree was interlocutory and requested that the trial court enter an amended divorce decree stating that the divorce was rendered on February 22, 2007 and dividing the property pursuant to the terms of the MSA.

On December 20, 2007, the trial court entered an amended final divorce decree that incorporated the terms of the MSA but not the AID because Gil refused to sign the latter document. The decree provided that the parties' marriage was dissolved in July 2007 and that the monthly payments of $12,500.00 began August 2007 and would end November 2014. However, in 2009, after hearing argument that the trial court lacked plenary power jurisdiction when it issued the December 2007 amended decree, the trial court held that amended decree was void.

### D. The Appealed Order

In early 2011, Peggy brought breach of contract and conversion claims and moved to enforce the MSA. Her petition alleged that the July 2007 divorce decree and the MSA failed to dispose of property owned by the parties before the February 2007 oral pronouncement of divorce. She also sought specific

7

performance of the terms of the MSA, including execution of a security agreement. Peggy then moved for partial summary judgment, seeking a determination by the trial court that the MSA was a valid, enforceable contract between the parties; that the July decree was interlocutory because it did not divide all of the parties' property; and that all property not divided in the MSA was community property subject to division. Gil did not file a response, and the trial court granted the motion. Gil then moved to set aside the default partial summary judgment, and the trial court granted his motion. In its order granting Gil's motion, the trial court held that the divorce was granted February 22, 2007 and that the July 2007 decree represented a "full and final determination of the community property division in this case."

Following a bench trial, in orders dated June 7, 2012, the trial court held in relevant part that:

(1) each party's share of the 1608 account would bear all costs and revenues accrued after apportionment in proportion to the values in the original agreement, that is, sixty-four percent to Gil, and thirty-six percent to Peggy;

(2) Gil was to pay Peggy a shortfall amount of $1,625.77, the remainder of a land lease payment;

(3) Gil was to pay Peggy fifty percent ($1,312.50) of the proceeds Gil had received from the Golden Triangle investment through July 25, 2007;

(4) each party was to pay his or her own court costs; and

(5) all relief requested and not expressly granted was denied.

8

Later, Peggy requested that the trial court make findings of fact and conclusions of law. In addition to restating the holdings reached in its order on Peggy's claims, the trial court determined that:

(1) no AID was necessary to complete the property division provided in the MSA, which itself was incorporated by the trial court into its July 2007 divorce decree;

(2) July 25, 2007 was the key date for determining the distribution of property;

(3) Gil was to pay fifty percent of a $4,000 yearly lease to Peggy;

(4) specific performance of the security agreement was inappropriate because Peggy failed to prove damages;

(5) no attorney's fees award was appropriate; and

(6) requests for healthcare reimbursement were denied for evidentiary insufficiency.

After moving for a new trial, Peggy filed a notice of appeal on September 4, 2012.

## II. Issues on Appeal

In nine issues, Peggy contends that

(1) the trial court erred by failing to specifically enforce an MSA term requiring Gil to provide a security agreement for Gil's monthly payments of $12,500 beginning the first month after the divorce;

9

(2) the trial court erred by failing to award Peggy her attorney's fees as a result of Gil's failure to execute and deliver the security agreement;

(3) the trial court erred by concluding that the divorce was rendered February 22, 2007, and that the decree signed July 25, 2007, represents a full and final determination of community property division in the case;

(4) the trial court abused its discretion by failing to divide and award community assets not set forth in the MSA and all community property increases and acquisitions after the MSA took effect;

(5) the trial court abused its discretion by failing to divide and award Gil's interest in Blackburn Holdings, LLC, acquired for $1,056,651 after execution of the MSA and prior to July 25, 2007;

(6) the trial court erred by apportioning income and account expenses accrued on the 1608 account according to the percentages provided in the MSA;

(7) the trial court erred by not awarding Peggy her attorney's fees on her successful claims regarding the Oscar Black lease and the proceeds from the Golden Triangle investment.

(8) the trial court abused its discretion by holding that child support payments Gil made directly to Peggy satisfied his child support obligation under the July decree, which expressly required that all payments be made through the Texas Child Support Disbursement Unit and that any direct payments would be in addition to and not in lieu of the support ordered in the July decree; and

(9) the trial court erred by rendering judgment on healthcare reimbursement claims that were not raised.

## A. Divorce Rendered February 22, 2007

In her third issue, Peggy argues that the trial court erred by setting aside the default partial summary judgment in favor of Peggy by determining that (1) the divorce was granted February 22, 2007, and (2) "the divorce pronounced on February 22, 2007 and signed on July 25, 2007 represents a full and final determination of the community property division in this case." In this issue, Peggy challenges the trial court's finding that it orally rendered the parties divorced pursuant to the terms of the MSA on February 22, 2007, and the conclusions of law that the trial court rendered the parties divorced on February 22, 2007, and that the entry of the final divorce decree on July 25, 2007, was a ministerial act.

### 1. Standards of Review

#### a. Summary Judgment

We review a summary judgment ruling de novo.[3] We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding evidence contrary to the nonmovant unless reasonable jurors could not.[4] We

---

[3]*Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).

[4]*Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

11

indulge every reasonable inference and resolve any doubts in the nonmovant's favor.[5]   A plaintiff is entitled to summary judgment on a cause of action if it conclusively proves all essential elements of the claim.[6]

## b.  Findings of Fact and Conclusions of Law

A trial court's findings of fact have the same force and dignity as a jury's findings and are reviewable for legal and factual sufficiency of the evidence to support them by the same standards.[7]   We defer to unchallenged findings of fact that are supported by some evidence.[8]

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital

---

[5]*20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).

[6]*See* Tex. R. Civ. P. 166a(a), (c); *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986).

[7]*Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *see also MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 663 n.3 (Tex. 2009).

[8]*Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014).

fact.[9]  In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not.[10]

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered.[11]

A party may not challenge conclusions of law for factual sufficiency, but we may review conclusions of law to determine their correctness based upon the facts.[12]  We will uphold a conclusion of law if the judgment can be supported on

---

[9]*Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), cert. denied, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960).

[10]*Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

[11]*Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

[12]*Citizens Nat'l. Bank v. City of Rhome*, 201 S.W.3d 254, 256 (Tex. App.—Fort Worth 2006, no pet.); *Dominey v. Unknown Heirs and Legal Representatives of Lokomski*, 172 S.W.3d 67, 71 (Tex. App.—Fort Worth 2005, no pet.).

any legal theory supported by the evidence.[13]  We review conclusions of law de novo,[14] and we will not reverse them unless they are erroneous as a matter of law.[15]

### 2. Substantive Law on Rendition

A judgment is rendered when a trial court makes an official pronouncement, either in writing or orally in open court, of its decision on the matter submitted to it for adjudication.[16]  After a judgment is rendered by oral pronouncement, the entry of a written judgment is a purely ministerial act.[17]  To be a judgment, the trial court's oral pronouncement must indicate intent to render a full, final, and complete judgment at the time the words are expressed.[18]  Thus,

---

[13]*Tex. Dep't. of Pub. Safety v. Stockton*, 53 S.W.3d 421, 423 (Tex. App.—San Antonio 2001, pet. denied).

[14]*State v. Heal*, 917 S.W.2d 6, 9 (Tex. 1996) (op. on reh'g).

[15]*Stockton*, 53 S.W.3d at 423.

[16]*James v. Hubbard*, 21 S.W.3d 558, 561 (Tex. App.—San Antonio 2000, no pet.); *In re Bland*, 960 S.W.2d 123, 124 (Tex. App.—Houston [1st Dist.] 1997, orig. proceeding).

[17]*Keim v. Anderson*, 943 S.W.2d 938, 942 (Tex. App.—El Paso 1997, no pet.); *see also Dunn v. Dunn*, 439 S.W.2d 830, 832–33 (Tex. 1969) (holding that oral rendition of divorce constituted final judgment even though judgment was not signed until after spouse's death).

[18]*S & A Rest. Corp. v. Leal*, 892 S.W.2d 855, 858 (Tex. 1995); *In re Marriage of Ellsworth*, No. 07-01-00072-CV, 2001 WL 1149035, at *3 (Tex. App.—Amarillo Sept. 28, 2001, no pet.) (not designated for publication).

the words, "[Y]our divorce *is* granted," constitute a rendition of judgment,[19] as do the words, "I'll grant your divorce today."[20]   But the words, "I *am going to* grant the divorce in this case,"[21] and the words, "The Court *will* approve the agreement . . . , and I *will* sign a written order to that effect," standing alone, do not.[22]

Whether a particular action constitutes a rendition of judgment is a question of fact.[23]   In determining whether an oral statement by the trial court constitutes a rendition of judgment, we look primarily to the words used by the court.[24]   Evidence beyond the words of the trial court at the time of the alleged judgment, such as later statements and writings by the court, is not controlling, but such evidence may be considered in ascertaining whether the trial court intended to render judgment at the time of the alleged oral rendition.[25]

---

[19]*In re Marriage of Joyner*, 196 S.W.3d 883, 887 (Tex. App.—Texarkana 2006, pet. denied) (emphasis added).

[20]*Baize v. Baize*, 93 S.W.3d 197, 200 (Tex. App.—Houston [14th Dist.] 2002, pet. denied).

[21]*James*, 21 S.W.3d at 561 (emphasis added).

[22]*In re M.G.F.*, No. 02-07-00241-CV, 2008 WL 4052992, at *2 (Tex. App.— Fort Worth Aug. 28, 2008, no pet.) (mem. op.).

[23]*Joyner*, 196 S.W.3d at 887 (citing *Bockemehl v. Bockemehl*, 604 S.W.2d 466, 469 (Tex. Civ. App.—Dallas 1980, no writ)).

[24]*See M.G.F.*, 2008 WL 4052992, at *3; *Joyner*, 196 S.W.3d at 887–88.

[25]*See Joyner*, 196 S.W.3d at 887–88; *see also Henry v. Cullum Co., Inc.*, 891 S.W.2d 789, 792–93 (Tex. App.—Amarillo 1995, writ denied) (determining that trial court rendered judgment on particular date when (1) trial court orally announced that it was granting partial summary judgment, even though there

### 3. Analysis

#### a. Present Intent

At the conclusion of the February 22, 2007 prove-up hearing, the trial court stated, "All right. I'm going to grant the divorce pursuant to the terms and provisions of the [MSA] that's been stated herein today, and I will sign the Decree upon presentment." Peggy argues that this language is not a clear statement of a present intent to render judgment. We disagree.

In *M.G.F.*, this court determined that the words "will approve" and "will sign" did not indicate an intent to render a full, final, and complete judgment.[26] In that case, the appellant argued that the following statement made by the trial court at the conclusion of a hearing at which the parties presented an agreement to reduce the appellant's child support obligation indicated the trial court's intent to render judgment:

> The Court will approve the agreement as stated here on the record in open court and approved by both parties in front of the Court, and I find that to be at this time in the best interest of the child, and I will sign a written order to that effect.[27]

was no reporter's record showing trial court's comments at conclusion of hearing; (2) agreed motion for severance of claims acknowledged oral rendition of partial summary judgment at close of hearing; and (3) docket-sheet notation initialed by trial judge evidenced court's action).

[26]2008 WL 4052992, at *3.

[27]*Id.* at *1.

16

In its findings of fact and conclusions of law, which the appellant did not challenge on appeal, the trial court found that it did not orally render judgment at the hearing.[28] We concluded that the record supported this finding because the trial court's use of the words "will approve" and "will sign" indicated the trial court's intention to render judgment in the future, which could not be a present rendition of judgment.[29]

In *Cook v. Cook*, we held that even though the visiting judge approved the settlement agreement after the prove-up hearing, he did not render at that time because he stated, "Upon submission of the final decree and signed by the Court, the divorce will be granted at that time, not today."[30]

Unlike the statements of the visiting judge in *Cook* and the trial court in *M.G.F.*, the trial court's statements in this case, when viewed in the context in which they were made, indicate a present intent to render a full, final, and complete judgment. During the prove-up hearing, the following exchange took place between Peggy and her attorney:

> Q. All right. You and Mr. Blackburn went to a mediation . . . on February the 8th, and he signed a[n MSA]; is that correct?
>
> A. Yes, sir.

---

[28] *Id.* at *2–3.

[29] *Id.* at *3 (citing *S & A Rest. Corp.*, 892 S.W.2d at 858; *James*, 21 S.W.3d at 561).

[30] 243 S.W.3d 800, 801–02 (Tex. App.—Fort Worth 2007, no pet.).

17

Q.    That [MSA] was filed in this cause, and you believe that that [MSA] is a just and right division of all of the assets and liabilities you and Dr. Blackburn acquired during the marriage?

A.    Yes, sir.

Q.    And the same thing—all of the entries in that [MSA] that deal with [your and Dr. Blackburn's minor child], do you believe they're in his best interest?

A.    Yes.

Q.    *Are you asking the court to approve the [MSA]—* approve the agreement you made with your husband about your assets, liabilities and your child, *and grant a divorce*?

A.    Yes.  [Emphasis added.]

When considered within the context of Peggy's testimony, we conclude that the trial court's language shows a present intent to render a full, final, and complete judgment on February 22, 2007.

Moreover, the docket sheet entry and later statements and writings made by the trial court indicate its intent to render judgment on February 22, 2007.  The trial court's docket entry for February 22, 2007, while not signed by the trial court judge, states, "Divorce granted pursuant to mediated Stlmt. Agreement, Decree to be signed upon presentment."[31]   At the May 7, 2007 hearing on Peggy's motion to sign the divorce decree, the trial court stated, "The court granted a divorce in this case on February 22nd with the understanding a decree would be

---

[31]*See Oak Creek Homes Inc. v. Jones*, 758 S.W.2d 288, 290–91 (Tex. App.—Waco 1988, no writ) (holding that judge's announcement that "I'll grant all the relief you've asked for" and docket notation of "default judgment," followed by judge's signature, amounted to rendition).

18

signed after circulation or maybe upon presentment."  The final decree signed by the trial court on July 25, 2007, also states that the divorce was "judicially PRONOUNCED AND RENDERED . . . on February 22, 2007 and further noted on the court's docket sheet on the same date."[32]  Therefore, we conclude that there is sufficient evidence that the trial court intended to render judgment on February 22, 2007.

### b.  Full, Final, and Complete

Next, Peggy argues that the trial court did not intend to render a full, final, and complete judgment on February 22, 2007, because the MSA did not divide community property acquired after its execution but before rendition or address community property income after its execution.[33]  Peggy argues that because all the property issues were not resolved, the trial court's February 22, 2007

---

[32] *See Joyner*, 196 S.W.3d at 888 (stating that June 28, 2004 final decree listing the date of judgment for the divorce as July 2, 2003 is additional information appellate court can use to decipher trial court's intent to render judgment on July 2, 2003).

[33] *See, e.g., Gamboa v. Gamboa*, 383 S.W.3d 263, 270–71 (Tex. App.— San Antonio 2012, no pet.) (holding that trial judge's language that it was "granting the divorce effective today" and "approv[ing] the settlement agreement" did not show a present intent to render a full, final, and complete judgment because issues of conservatorship, possession and access, child support, medical support, and the division of community debts and liabilities remained).

19

pronouncement of divorce was interlocutory, the parties are still married, and the community estate still exists.[34]

The MSA states that (1) it "is a full and complete settlement of all of the issues in this case," (2) "[t]he parties hereby release each other from any and all claims, plead, or unplead, that may exist between them," and (3) "[e]ach Party warrants that all property owned by them jointly or individually has been disclosed and divided by [the MSA]." According to the MSA, Gil chose not to have legal representation and was representing his own interests on February 8, 2007; Peggy was represented by an attorney. At the February 22, 2007 prove-up hearing, Peggy confirmed that the MSA was a division of all of the assets and liabilities the parties acquired during the marriage and asked the trial court to approve the MSA and grant the parties a divorce.

Peggy also does not dispute that the MSA was binding on the parties under family code sections 6.602 and 153.0071.[35] Section 6.602 authorizes the parties to enter into binding mediated agreements concerning the dissolution of the marriage relationship.[36] This section generally refers to property that must be

---

[34]*See Vautrain v. Vautrain*, 646 S.W.2d 309, 316 (Tex. App.—Fort Worth 1983, writ dism'd) ("The divorce was interlocutory until the disposition of all issues, . . . and the parties remained married up through that date.").

[35]Tex. Fam. Code Ann. § 6.602 (West 2006), § 153.0071 (West 2014).

[36]*See id.* § 6.602.

divided between the parties.[37]  Section 153.0071 has identical language allowing the parent-child relationship to be determined by agreed mediation.[38]  This section generally governs child conservatorship, possession, access, child support, and related matters.[39]  Settlement agreements complying with section 6.602 are immediately enforceable, not subject to repudiation by a party, and, with certain limited exceptions, binding on the trial court without approval or determination of whether the agreement's terms are just and right.[40]  Section 6.602 allows the parties to make their agreement binding at the time of execution rather than at the time of rendition, creating a "procedural shortcut" for their enforcement.[41]  Not only are the parties bound to the agreement, but they are entitled to a judgment on the agreement.[42]

---

[37] *See id.*

[38] *Id.* § 153.0071.

[39] *See id.*

[40] *See Joyner*, 196 S.W.3d at 889; *Cayan v. Cayan*, 38 S.W.3d 161, 164–66 (Tex. App.—Houston [14th Dist.] 2000, pet. denied); *see also Spiegel v. KLRU Endowment Fund*, 228 S.W.3d 237, 242 (Tex. App.—Austin 2007, pet. denied) (noting that when MSA meets section 6.602's requirements, "it must be enforced in the absence of allegations that the agreement calls for the performance of an illegal act or that it was 'procured by fraud, duress, coercion, or other dishonest means'" (quoting *Boyd v. Boyd*, 67 S.W.3d 398, 403 (Tex. App.—Fort Worth 2002, no pet.))).

[41] *Cayan*, 38 S.W.3d at 165–66.

[42] Tex. Fam. Code Ann. § 6.602(b), (c); *Cayan*, 38 S.W.3d at 165.

Here, the MSA was binding on the parties as of February 8, 2007, because it was signed by Gil and Peggy, signed by Peggy's attorney, and provided, in a separate paragraph,

> **THE PARTIES UNDERSTAND AND AGREE THAT THIS AGREEMENT IS NOT SUBJECT TO REVOCATION** (as set out in § 6.602 and § 153.0071(d) of the Texas Family Code and the Civil Practice and Remedies Code, Texas Property Code and other applicable statutes).[43]

Thus, the parties were entitled to judgment on the MSA, which, according to its terms, divided all of the parties' community property.

The judgment granting the divorce was rendered February 22, 2007, and because the trial court had no authority to exclude it, the MSA was part of the divorce rendition.[44]  To the extent that any assets were acquired by the community from the time the MSA was signed on February 8, 2007, until the parties were divorced on February 22, 2007, or any community property income was generated on divided property after the MSA was executed until the parties were divorced on February 22, 2007, chapter 9 of the family code provides the avenue for relief.[45]  We overrule Peggy's third issue.

---

[43]*See* Tex. Fam. Code Ann. § 6.602(b) (setting forth requirements for a binding MSA).

[44]*See Joyner*, 196 S.W.3d at 891.

[45]*See* Tex. Fam. Code Ann. § 9.201 (West 2006) (authorizing trial court to order postdivorce division of community property that was not divided in a final divorce decree).

**B. Was the oral rendition set aside?**

In her fourth issue, Peggy contends that the trial court abused its discretion by failing to divide and award community assets not set forth in the MSA and all community property increases and acquisitions after the MSA's February 8, 2007 execution. As part of this issue, Peggy claims that the postrendition temporary order in March 2007 and the signing of the July decree effectively set aside the February 8, 2007 rendition of divorce. Peggy repeats her challenge of the trial court's finding and legal conclusions raised in her third issue and also challenges the trial court's conclusions that the MSA was incorporated into the July decree, an AID was not required, and an AID was not necessary to complete the division of property stated in the MSA.

**1. Temporary Order**

The November 2006 temporary order stated that it would "continue in force until the signing of the Final Decree of Divorce or until further order of this Court." On January 4, 2007, Peggy filed a motion to modify the November 2006 temporary order and for additional temporary orders. At the January 30, 2007 hearing on her motion, the parties agreed to modify the November 2006 temporary order, and they agreed to additional temporary orders, but the order memorializing their agreement was not signed by the trial court until March 14, 2007, after the rendition. In April 2007, Peggy filed a motion to enforce the November 2006 temporary order and the January 2007 temporary order. Gil also filed a motion to enforce the temporary orders against Peggy. On

23

June 4 and June 20, 2007, the trial court held hearings on both parties' motions, and on June 29, 2007, the trial court found that both parties had violated various aspects of the November 2006 and March 2007 orders.

Peggy argues that the trial court effectively set aside its February 22, 2007 oral rendition of divorce by entering the March 2007 temporary order because the temporary order required Gil to continue paying her half of his income each month if a final trial was not completed by May 15, 2007. She cites *Ex parte Chunn*[46] for the proposition that the modification and enforcement of temporary orders after an oral rendition of divorce effectively sets aside that rendition. In *Chunn*, the parties reached a verbal agreement on conservatorship and possession of their three minor children, division of most of their community property, and other matters, which the parties memorialized in a document entitled "Points of Agreement."[47] After the parties proved up their agreement before the trial court, the trial court approved the agreement and granted the divorce effective that day.[48] The case was reset for entry of judgment, but on the day of the hearing, both parties refused to sign the proposed judgment.[49]

---

[46]881 S.W.2d 912 (Tex. App.—Houston [1st Dist.] 1994, orig. proceeding).

[47]*Id.* at 913.

[48]*Id.* at 913–14.

[49]*Id.* at 914.

The husband later filed a motion for entry of a decree of divorce pursuant to the agreement approved at the prove-up hearing, but the wife no longer agreed with the terms of their agreement.[50]  The trial court denied the husband's motion for entry of a decree, finding there was no longer an agreement between the parties as to the issues involved in the divorce, and set the case for trial.[51] The jury trial ended in a mistrial, and shortly thereafter, the trial court entered temporary orders on the wife's motion, requiring the husband to provide health insurance for his wife and their children.[52]  The trial court held the husband in contempt for violating the temporary orders by failing to pay for his wife's health insurance.[53]

The husband filed a petition for writ of mandamus, arguing that the trial court lacked subject matter jurisdiction to order him to provide health insurance for his wife because the temporary order was a form of illegal postdivorce alimony.[54]  Relying on *Dunn*,[55] the husband argued that the trial court's pronouncement of an agreed judgment was effective as a rendition of judgment

---

[50]*Id.*

[51]*Id.*

[52]*Id.* at 915.

[53]*Id.*

[54]*Id.*

[55]439 S.W.2d 830.

25

in settlement of the parties' rights.[56] The court of appeals disagreed, stating that "because no divorce decree was signed, it was within the [trial] court's plenary jurisdiction to effectively set aside the oral pronouncement of divorce."[57] The court of appeals concluded that the parties were not divorced and held that the trial court had jurisdiction and authority to grant the wife's motion for temporary orders requiring her husband to provide her with health insurance.[58]

Peggy contends that "once the trial court [in *Chunn*] entered the written temporary order to add a responsibility to provide health insurance after the oral rendition on an agreement read into the record that did not provide for such coverage, the spouses were not divorced." But the trial court's action in *Chunn* that set aside its oral pronouncement was its finding that there was no longer an agreement between the parties as to the issues in the divorce, not the entry of the temporary orders.[59] Accordingly, we cannot agree with Peggy that *Chunn* stands for the proposition that "the entry of a new temporary order 'effectively' sets aside the oral pronouncement of divorce."

---

[56] *Chunn*, 881 S.W.2d at 915.

[57] *Id.* (citing *Louwien v. McDowell*, 534 S.W.2d 421, 422 (Tex. Civ. App.—Dallas 1976, orig. proceeding (explaining that an oral pronouncement is a valid judgment as long as the oral pronouncement is not set aside and the trial court can grant a new trial or otherwise change its judgment at any time if no written judgment has been signed))).

[58] *Id.*

[59] *See id.* at 914.

26

Temporary orders typically expire with the entry of a final judgment.[60] Although a temporary order may not supersede a judgment once the temporary order has expired, a trial court may enter temporary orders independently of the final decree.[61] The rendition of a final divorce decree does not in itself nullify any temporary order with respect to payments past due.[62] The decree supersedes the temporary order with respect to future support, but the obligation for past support, as fixed by the temporary order, continues unless modified by the provisions of the divorce decree.[63] Even though these legal principles are true, they pertain to the determination of the continued enforceability of temporary orders after the entry of a final decree, not the effect the entry of temporary orders has on the finality of an oral rendition of divorce. We reject Peggy's contention that a temporary order can trump a final community property division.

## 2. The Signing of the July Decree

Peggy also contends that the trial court's signing of the final decree in July 2007 set aside its February 22, 2007 oral rendition of divorce. In support of this

---

[60] *Coke v. Coke*, 802 S.W.2d 270, 273 (Tex. App.—Dallas 1990, writ denied).

[61] *See id.*; *see also* Tex. Fam. Code Ann. § 6.502 (West 2006).

[62] *See Ex parte Shaver*, 597 S.W.2d 498, 500 (Tex. Civ. App.—Dallas 1980, orig. proceeding).

[63] *Id.*

contention, she argues that the July decree was ambiguous as to finality and, in the alternative, is a void judgment.

## a. Finality

A judgment is not final "unless it actually disposes of every pending claim and party or unless it clearly and unequivocally states that it finally disposes of all claims and all parties."[64] Peggy acknowledges that the July decree contains language—"this judgment finally disposes of all claims and all parties and is appealable"—that, absent more, would appear to make the judgment final and appealable.[65] Peggy argues, however, that the decree is ambiguous as to finality because the following provisions create an ambiguity concerning whether the trial court intended to judicially determine any, much less all, of the claims between Gil and her absent their signatures agreeing to the substance of the decree:

- The Court finds that the parties have entered into a written agreement as contained in this decree by virtue of having approved this decree as to both form and substance.

- The agreements in this Final Decree of Divorce were reached in mediation . . . . This Final Decree of Divorce is stipulated to represent a merger of a [MSA] between the parties. To the extent there exist any differences between the [MSA] and this Final Decree of Divorce, the Final Decree of Divorce shall control in all instances.

---

[64] *See Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 205 (Tex. 2001).

[65] *See id.* at 206 ("A statement like, 'This judgment finally disposes of all parties and all claims and is appealable', would leave no doubt about the court's intention.").

28

- Petitioner and Respondent acknowledge that they have affixed their signature to this Final Decree of Divorce.

- APPROVED AND CONSENTED TO AS TO BOTH FORM AND SUBSTANCE:

_____
PEGGY M. BLACKBURN, Petitioner


_____
GILDEN B. BLACKBURN, Respondent

In determining whether a judgment is ambiguous, we apply the same rules we would use to ascertain the meaning of other written instruments.[66] To determine whether an order is final, we must examine the express language of the order and whether the order actually disposes of all claims between the parties.[67] A judgment is final only if it either actually disposes of all claims and parties before the court, regardless of its language, or it states, with unmistakable clarity, that it is a final judgment.[68] Whether an order is a final judgment must be determined from its language and the record in the case.[69] Even though neither Peggy nor

---

[66]*See Lal v. Harris Methodist Fort Worth*, 230 S.W.3d 468, 474 (Tex. App.—Fort Worth 2007, no pet.) ("The same rules of interpretation apply in construing the meaning of court orders as in ascertaining the meaning of other written instruments." (citing *Lone Star Cement Corp. v. Fair*, 467 S.W.2d 402, 404–05 (Tex. 1971) (original proceeding))).

[67]*Lehmann*, 39 S.W.3d at 200.

[68]*Id.* at 204.

[69]*Id.*

Gil signed the July decree and it states that it controls over the MSA in the event the two conflict, it is not ambiguous as to finality because it states with unmistakable clarity that it is a final judgment.[70]

### b. Decree Not Void

Next, Peggy attempts to collaterally attack the July decree on the grounds that it is void because it does not set forth a property division. The MSA provided that its terms would be incorporated into an agreed final decree of divorce and that "[t]hose portions, if required, of [the MSA] requiring contractual language w[ould] be incorporated into an [AID]." With respect to the AID, the July decree stated:

> **Agreement of Parties**
>
> . . . .
>
> The Court finds that the parties have entered into an [AID], in a document separate from this Final Decree of Divorce. The Court approves the agreement and incorporates it by reference as part of this decree as if it were recited herein verbatim and orders the parties to do all things necessary to effectuate the agreement. A copy of the agreement is filed with the records of this Court . . . .
>
> . . . .
>
> **Division of Marital Estate**
>
> The Court finds that the parties have reached an agreement as to the division of their marital estate and it is set forth in the [AID]. The Court has reviewed such [AID] and finds that it is just, right and reasonable and approves the same, and hereby incorporates the [AID] as set out verbatim in this Final Decree of Divorce, and further

---

[70]*See id.*

30

finds that such [AID] is enforceable as a judgment or a contract, as provided by law.

The parties never executed an AID. They also never challenged the divorce decree on direct appeal or by bill of review. The Texas Supreme Court has held,

As with other final, unappealed judgments which are regular on their face, divorce decrees and judgments are not vulnerable to collateral attack. The decree must be void, not voidable, for a collateral attack to be permitted. Errors other than lack of jurisdiction over the parties or the subject matter render the judgment voidable and may be corrected only through a direct appeal.[71]

Peggy contends that the July decree is void as a final decree of divorce because the trial court lacked jurisdiction to enter a final decree of divorce that does not divide the community property of which it is aware. Family code section 7.001 makes the division of property in a divorce action mandatory.[72] When complained of and properly presented for review, the failure of the trial court to order a division of property is error.[73] Such a failure, however, does not render the decree void, and if no complaint is made, as here, the divorced parties become joint owners of or tenants in common in the property just as if they had

---

[71]*Hagen v. Hagen*, 282 S.W.3d 899, 902 (Tex. 2009) (citations omitted).

[72]*See* Tex. Fam. Code Ann. § 7.001 (West 2006) ("In a decree of divorce or annulment, the court shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage.").

[73]*Blancas v. Blancas*, 495 S.W.2d 597, 601 (Tex. Civ. App.—Texarkana 1973, no writ) (citing *Russell v. Russell*, 79 S.W.2d 639 (Tex. Civ. App.—Fort Worth 1935, writ dism'd)).

never been married.[74]  Further, here, the MSA divided the community estate. That MSA provides that "[i]t is agreed that any assets of the parties not awarded or divided by this Final Decree of Divorce are subject to future division as provided in the Texas Family Code."  An MSA is enforceable even when it is not incorporated into the decree.[75]  Thus, the parties were entitled to judgment on the MSA, which, according to its terms, divided all of the parties' community property.  Again, as to any assets acquired or income generated on former community property after the MSA's execution but before rendition, chapter 9 of the family code provides the avenue for relief.[76]

We overrule Peggy's fourth issue.

## C. Blackburn Holdings, LLC

In her fifth issue, Peggy complains that the trial court erred by not dividing the fifty percent interest in Blackburn Holdings, LLC that Gil acquired on June 6, 2007, in exchange for a capital contribution of $1,056,651.  In 2007, Blackburn Holdings, LLC's assets were valued at $2,069,033 and generated $26,667 in

---

[74]*Id.* (citing *Taylor v. Catalon*, 140 Tex. 38, 166 S.W.2d 102 (1942); *Kirkwood v. Domnan*, 80 Tex. 645, 16 S.W. 428 (1891); *McDaniel v. Thompson*, 195 S.W.2d 202 (Tex. Civ. App.—San Antonio 1946, writ ref'd)).

[75]*See Spiegel*, 228 S.W.3d at 242 ("[B]y providing that when an agreement meets the requirements of section 6.602, the agreement 'is binding' and 'a party is entitled to judgment' on it, the statute shows the legislature's intention that the agreement be binding even in the absence of a judgment incorporating it.").

[76]*See* Tex. Fam. Code Ann. § 9.201.

income.  We determined above that the judgment granting the divorce was rendered February 22, 2007.  When Gil acquired his interest in Blackburn Holdings, LLC in June 2007, he and Peggy could no longer acquire community property because they were divorced.[77]  Thus, Gil's interest in Blackburn Holdings, LLC was not part of the community, and the trial court did not err by failing to divide Gil's interest in Blackburn Holdings, LLC.[78]  Accordingly, we overrule Peggy's fifth issue.

### D.  The 1608 Account

In her sixth issue, Peggy contends that the trial court abused its discretion by apportioning the 1608 account's increase in value after July 25, 2007, as well as expenses incurred, in accordance with the ownership percentages set out in the MSA.  In the MSA, the parties valued the 1608 account at $4,189,080, and they agreed that Peggy would receive $1,500,000 of the account (approximately thirty-six percent) and Gil would receive the remaining $2,689,080 (approximately sixty-four percent).  But the account was not distributed because of a dispute regarding the accumulated assets and expenses.  With respect to the 1608 account, the trial court ordered in its "Order on Petition for Breach of Contract, Conversion, Division of Property and Motion for Enforcement of Mediated Settlement Agreement and Third-Party Petition; on Petition in Intervention for

---

[77] *See Joyner*, 196 S.W.3d at 892.

[78] *See id.*

Attorney's Fees; and Construing Mediated Settlement Agreement for Final Distribution Of Assets" as follows:

> The assets of Account #1608 are apportioned as of July 25, 2007 to be: $2,894,531.87 to [Gil] and $1,721,625.08 to [Peggy] with each party's portion bearing all revenues and costs accrued or incurred since July 25, 2007 in the proportion of the original agreement, being 64% to [Gil] and 36% to [Peggy].

Peggy argues that the trial court abused its discretion by not making any adjustments in her favor on the interest accrued on the 1608 account after July 25, 2007, because "the court knew that Gil had not been following the MSA and, in fact, had been fighting it since 2007."

On February 8, 2007, Gil and Peggy signed the MSA, agreeing to settle all issues regarding their divorce. While the MSA did not expressly contemplate how increases or interest earned on the 1608 account between the signing of the MSA and the distribution of funds from the account were to be divided, the parties did agree to divide the account with Peggy receiving approximately thirty-six percent and Gil receiving sixty-four percent. As stated above, the MSA is binding on the parties and the court.[79] We therefore cannot conclude that the trial court abused its discretion by apportioning the account, including its increases, according to the MSA's percentages. Accordingly, we overrule Peggy's sixth issue.

---

[79] *See* Tex. Fam. Code Ann. § 6.602.

### E.    Attorney's Fees Regarding Oscar Black Lease and Golden Triangle Investment Proceeds

In her seventh issue, Peggy complains that the trial court erred by not awarding her attorney's fees on her successful claims under the MSA regarding the Oscar Black lease and proceeds from the Golden Triangle investment. Peggy argues that she is entitled to attorney's fees because she prevailed on her breach of contract claims related to the Oscar Black lease and the Golden Triangle investment.[80]  The MSA did not mention the Oscar Black lease, but it divided the "Golden Triangle Limited Partnership Apartment Complex," which was valued at $150,000, equally between Peggy and Gil.  At trial, Peggy claimed that proceeds from the Oscar Black lease and a dividend check from the Golden Triangle investment were undivided in the MSA because Gil failed to disclose them.  The trial court awarded Peggy $1,625.77 as the remainder of the payment of fifty percent of the Oscar Black land lease and $1, 312.50 for fifty percent of the proceeds received by Gil as a result of the Golden Triangle investment.  The trial court did not explicitly find a contractual breach.

Attorney's fees are recoverable only if authorized by statute or by contract.[81]  Section 38.001 of the Texas Civil Practice and Remedies Code provides that "[a] person may recover reasonable attorney's fees from an

---

[80] *See* Tex. Civ. Prac. & Rem. Code. Ann. § 38.001 (West 2015).

[81] *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 669 (Tex. 2009).

individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract."[82] To obtain an award of attorney's fees under section 38.001, "a party must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover damages."[83] However, "[p]arties are free to contract for a fee-recovery standard either looser or stricter than Chapter 38's."[84] When parties include an attorney's fees provision in a contract, the language of the contract controls, rather than the language of the statute.[85]

In a section labeled "Attorney's Fees," the MSA states that "[e]ach party shall pay their own attorney's fees incurred on their behalf." The MSA further provides in the "Execution of Documents" section that "[i]f either party fails to comply with this provision, that party will pay to the other all attorney's fees, costs, and other expenses reasonably and necessarily incurred as a result of that failure." Peggy's claims relating to the Oscar Black lease and the Golden Triangle investment were not related to the "Execution of Documents" section of the MSA. She was therefore not automatically entitled to attorney's fees under

[82]Tex. Civ. Prac. & Rem. Code. Ann. § 38.001.

[83]*Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997).

[84]*Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex. 2009).

[85]*See id.* (reviewing definition of "prevailing party" under contract to determine whether plaintiff who had not recovered any actual damages was entitled to recover attorney's fees).

the MSA, but she was also not automatically excluded from an attorney fees award.

Peggy argues that under civil practice and remedies code section 38.001, she has a "mandatory right" to her reasonable and necessary attorney's fees related to the prosecution of these claims.[86]  Even if we liberally read the "Breach of Contract and Conversion" section of Peggy's live petition to implicitly reference the Oscar Black lease and Golden Triangle investment, Peggy's attorney fees claim fails.  As this court has previously held,

> To recover reasonable attorney's fees for a claim based on an oral or written contract, (1) the claimant must be represented by counsel, (2) the claimant *must present the claim* to the opposing party, and (3) payment for the just amount owed must not have been tendered before the expiration of the thirtieth day after the claim is presented.  . . .

> The purpose of the presentment requirement is to allow the person against whom the claim is asserted an opportunity to pay within thirty days of receiving notice of the claim, thereby avoiding the obligation to pay attorney's fees.  The party seeking attorney's fees must plead and prove that he or she presented a contract claim to the opposing party and that the opposing party failed to tender performance.  No particular form of presentment is required.  Oral presentment of a claim is sufficient to satisfy the requirement.  However, neither the filing of a suit, nor the allegation of a demand

---

[86] *See Ulico Cas. Co. v. Allied Pilots Assoc.*, 187 S.W.3d 91, 109–10 (Tex. App.—Fort Worth 2005) ("A trial court must award attorney's fees to the prevailing party in a suit founded on a written or oral contract if there is evidence of the reasonableness of the fees."), *rev'd on other grounds*, 262 S.W.3d 773 (Tex. 2008).

in the pleadings can, alone, constitute presentment of a claim or a demand that a claim be paid.[87]

Here, Peggy was required to plead and prove that she made presentment of her claim to Gil and that Gil did not satisfy the claim within thirty days.[88] Peggy did not so plead. We therefore conclude that the trial court did not err by not awarding Peggy attorney's fees on these claims under section 38.001. Accordingly, we overrule Peggy's seventh issue.

## F. Security Agreement and Related Attorney's Fees

In her first issue, Peggy argues that the trial court erred by not specifically enforcing Gil's obligation under the MSA to provide a security agreement to secure his monthly payment obligations of $12,500. To equalize the property division in the MSA, Gil agreed to pay Peggy $1,087,500 in eighty-seven monthly payments of $12,500 on the fifteenth of each month beginning the first month after the divorce. Peggy conceded at oral argument that she has received and accepted the entire $1,087,500. Because we hold above that the divorce was rendered in February 2007, and because we also hold that Gil has fulfilled this monetary obligation to Peggy despite the absence of a security agreement, we overrule this issue as moot.

---

[87] *Whitmire v. National Cutting Horse Ass'n*, No. 02-11-170-CV, 2012 WL 4815413, at *15 (Tex. App.—Fort Worth Oct. 11, 2012, no pet.) (mem. op.) (citations omitted).

[88] *See id.*

In her second issue, Peggy contends that the trial court erred by failing to award her attorney's fees incurred as a result of Gil's failure to execute and deliver the security agreement. But given Peggy's testimony that Gil had fulfilled his monthly payment obligations from March 2007 through the trial in February 2012, the trial court could have properly concluded that any attorney's fees Peggy may have incurred as a result of Gil's failure to execute the security agreement were not reasonably or necessarily incurred as a result of that failure. Thus, we conclude that the trial court did not err by finding and concluding that Peggy was not entitled to recover her attorney's fees regarding the security agreement. Accordingly, we overrule Peggy's second issue.

## G. Credit for Direct Child Support Payments

In her eighth issue, Peggy argues that the trial court erred by determining that seven child support payments Gil made directly to her counted as child support payments under the July 2007 decree. The MSA, signed in February 2007, did not require Gil to make child support payments to the state disbursement unit and stated that payments must be made directly to Peggy: "[Gil] shall pay to [Peggy] child support of $1200.00 per month, with the first payment being due and payable on March 1, 2007 and a like payment of $1,200 being due and payable on the 1ST day of each month thereafter." The July 2007 decree obligated Gil to pay Peggy child support of $1,200 per month and required that the child support payments "be made through the state disbursement unit . . . and thereafter promptly remitted to [Peggy] for the support

39

of the child." The decree further provided that the child support payments "shall be exclusively discharged in the manner ordered and that any direct payments made by [Gil] to [Peggy] . . . are deemed in addition to and not in lieu of the support ordered in this decree." Gil paid directly to Peggy $1,200 per month from March 2007 through September 2007. His first payment made through the disbursement unit occurred on October 23, 2007. The attorney general informed the trial court that "there was a delay in getting the [decree] set up and payment place being set up as well."

In its "Order Confirming Child Support Credit," the trial court found that Gil made monthly child support payments in the amount of $1,200 directly to Peggy from March 2007 (the month after the MSA was signed) through September 2007 and gave Gil credit for those payments to determine that Gil had overpaid child support in the amount $5,856.68 as of February 29, 2012. Peggy admitted that Gil had never gone a month without paying a $1,200 child support payment.

We do not have jurisdiction to entertain the merits of this issue. Peggy's notice of appeal does not list the trial court's "Order Confirming Child Support Credit" as an order that she is appealing. This order, signed June 7, 2012, the same day as the order listed in her notice of appeal—"Order on Petition for Breach of Contract, Conversion, Division of Property and Motion for Enforcement of Mediated Settlement Agreement and Third-Party Petition; on Petition in Intervention for Attorney's Fees; and Construing Mediated Settlement Agreement for Final Distribution of Assets"—and approved as to form by attorneys for

40

Peggy, Gil, and the Attorney General of Texas, was an appealable, final order, not interlocutory,[89] despite that mischaracterization applied to it at trial and on appeal by Peggy. No party—Peggy, Gil, or the Office of the Attorney General— appealed it. Because the confirmation of child support order was not timely appealed, we have no jurisdiction of this issue. In the interest of finality, however, we point out that even if we had jurisdiction, we would hold that the trial court did not abuse its discretion by indirectly denying Peggy a potential double recovery of the child support payments at issue.[90] We dismiss Peggy's eighth issue.

---

[89]*See The Office of the Attorney Gen. of Tex. v. Scholer*, 403 S.W.3d 859, 861 (Tex. 2013) (resolving appeal of child support order).

[90]*See In re C.S.*, No. 11-12-00294-CV, 2014 WL 972310, at *3 (Tex. App.—Eastland Mar. 6, 2014, no pet.) (mem. op.) (stating that when determining the amount of child support arrearage, trial court may consider evidence of direct payments from the obligor to the obligee even when the divorce decree requires obligor to make payments through the court's registry); *Buzbee v. Buzbee*, 870 S.W.2d 335, 339 (Tex. App.—Waco 1994, no writ) (op. on reh'g) (same); *see also Higgins v. Higgins*, No. 05-98-02014-CV, 2000 WL 1264636, at *4 (Tex. App.—Dallas Sept. 7, 2000, no pet.) (op. on reh'g) (not designated for publication) (stating that even though trial court was not required to give father credit for direct payments, the evidence supported the trial court's implied finding that these payments were for child support and that mother's acceptance of payments from father waived her right to have these payments made through the Dallas County Child Support Office); *Niles v. Rothwell*, 793 S.W.2d 77, 79 (Tex. App.—Eastland 1990, no writ) (holding that evidence that mother accepted direct child support payments supported the trial court's implied finding that mother waived her right to insist on payment through the court's registry).

41

## H. Healthcare Reimbursement

In her ninth issue, Peggy argues that the trial court erred by entering judgment on healthcare reimbursement claims because no such claims were raised by the parties' pleadings or tried by consent. In its findings and conclusions, the trial court found, "On the remaining issues before the Court, the Court ruled as follows . . . Healthcare reimbursement—[i]nsufficient evidence—denied," and concluded that "[a]ll claims related to damages for healthcare reimbursement should be and are denied." The record reflects that neither of the parties pled any claims for healthcare reimbursement and that these claims were not tried by consent. During trial, the trial judge also stated that the issue of healthcare reimbursement claims was not before the trial court because they had not been pled. The trial court's final judgement does not expressly reference healthcare reimbursement claims but states that "all relief requested in this case and not expressly granted is denied."

Because no healthcare reimbursement claims were pled or tried by consent, the evidence is legally and factually insufficient to support the trial court's finding that any healthcare reimbursement claims were denied for insufficient evidence, and the conclusion of law is wrong as a matter of law. Accordingly, we sustain Peggy's ninth issue, reverse the trial court's judgment to the extent that it implicitly adjudicated any healthcare reimbursement claims, and

render judgment that no healthcare reimbursement claims were raised or adjudicated.[91]

## III. Conclusion

We overrule Peggy's first seven issues and dismiss her eighth issue. But we sustain her ninth issue, reverse the trial court's judgment to the extent that it adjudicated any healthcare reimbursement claims, and render judgment that no such claims were raised or adjudicated. We affirm the trial court's judgment as modified.

/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT AND WALKER, JJ.

DELIVERED: May 7, 2015

---

[91]*See City of Lubbock Zoning Bd. of Adjustment v. Ward*, No. 07-96-00254-CV, 1997 WL 136656, at *2 (Tex. App.—Amarillo Mar. 26, 1997, no writ); *Cole v. Cole*, 880 S.W.2d 477, 483 (Tex. App.—Fort Worth 1994, no writ).

43